# Exhibit 1

# TY CLEVENGER
*Attorney at Law*
1095 Meadow Hill Drive
Lavon, Texas 75166

telephone: 979.985.5289     tyclevenger@yahoo.com
facsimile: 979.530.9523     Texas Bar No. 24034380

January 7, 2015

Mr. Jack Smith, Chief
Public Integrity Section, Criminal Division
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530-0001

Mr. Joseph S. Campbell, Asst. Director
FBI Criminal Investigative Division
935 Pennsylvania Avenue, NW
Washington, D.C. 20535-0001

       Re:    U.S. District Judge Ellen S. Huvelle (D.D.C.), *et al*.

Mr. Smith and Mr. Campbell:

     I am an attorney in Texas, and I write concerning a fraud perpetrated on various federal courts by attorneys in New York and Maryland. I have enclosed evidence that the attorneys in question fabricated an affidavit, tampered with evidence, and suborned perjury in order to obtain a $7 million judgment against my former client and Stanford Law School classmate, Wade Robertson. During the summer of 2014, I learned of evidence that one of the attorneys altered the plaintiff's medical records in order to conceal the fact that the plaintiff suffers from chronic paranoid schizophrenia, a severe mental illness that alters his perception of reality, causes him to hallucinate, and renders him pathologically prone to lie. Obviously, that would have been important information in a case where the jury's verdict resulted largely from the plaintiff's testimony.

     I have directed this letter to both of you because I recently learned that U.S. District Judge Ellen S. Huevelle of the District of Columbia was communicating *ex parte* with some of these attorneys even as she was turning a blind eye to their criminal misconduct, and there is circumstantial evidence that she may have intervened to prevent a grievance committee investigation of their misconduct. I have also learned of evidence suggesting that Judge Huvelle communicated *ex parte* with the plaintiff's psychiatrist and learned that the plaintiff was a paranoid schizophrenic, yet did nothing to address the false representations made to her court and my client

regarding the plaintiff's mental health. In response to my efforts to expose the fraud (and, potentially, her role in it), Judge Huvelle has retaliated against me harshly.

While Judge Huvelle may or may not have done anything worthy of prosecution, the attorneys in question have certainly committed crimes, and Judge Huvelle has gone to considerable lengths to protect them. In the addendum to this letter, I have explained in detail the evidence of fraud and obstruction of justice. The enclosed CD contains all of the exhibits referenced in the addendum. Some of the events are nearing the limitations deadline for prosecution, but some of the fraud is ongoing.

Please contact me at the number listed above if you need additional information. Thank you in advance for your consideration.

Sincerely,

Ty Clevenger

cc: The Hon. James M. Cole, Deputy Attorney General
       U.S. Department of Justice

# ADDENDUM
In re U.S. District Judge Ellen S. Huelle, *et al*.

INTRODUCTION

As a starting point, I will first introduce the cast of characters. Wade Robertson is my former classmate and client, and William C. Cartinhour, Jr. is his former business partner. Most of the evidence of criminal activity arises from two related cases: *Wade A. Robertson v. William C. Cartinhour, Jr.*, Case No. 1:09-cv-1642 (D.D.C. 2009)(hereinafter "*Robertson I*") and *Wade A. Robertson v. William C. Cartinhour, Jr.*, Case No. 1:09-cv-1642 (S.D.N.Y. 2009), later Case No. 11-cv-01919 (D.D.C.) (hereinafter "*Robertson II*") after transfer. In both cases, Mr. Robertson sued Mr. Cartinhour, although Mr. Cartinhour filed counter-claims in *Robertson I* and for all practical purposes became the plaintiff in that case.

In *Robertson I*, Mr. Cartinhour was represented by Michael Bramnick, Patrick Kearney, Carlton Obecny, and Robert Selzer of Selzer Gurvitch Rabin Wertheimer Polott & Obecny, P.C. in Bethesda, Maryland. In *Robertson II*, Mr. Cartinhour was represented by Dean Yuzek and Cherish O'Donnell of Ingram Yuzek Gainen Carroll & Bertolotti, LLP while the case was pending in New York. After the case was transferred to D.C., Mr. Cartinhour was also represented by Jeffrey Bloom, a sole practitioner in Maryland. Mr. Kearney and Mr. Bloom later entered appearances in *Robertson II* as well.

**Attorneys in Maryland**

Michael Bramnick
Patrick Kearney
Carlton Obecny
Robert Selzer
Michael Bloom

**Attorneys in New York**

Dean Yuzek
Cherish O'Donnell

In *Robertson I*, Mr. Cartinhour's attorneys portrayed him as elderly, easily confused, and in poor health. However, Mr. Cartinhour attended Princeton University and graduated from Emory Medical School, and even after trial, when it suited his purposes, he described himself as a sophisticated investor. *See* March 15, 2011 Affidavit of William Cartinhour (Exhibit 1). Based on recently obtained evidence, we now know that Mr. Cartinhour suffers from chronic paranoid schizophrenia, he has been institutionalized for years at a time, and he is pathologically prone to lie.

Apparently Mr. Cartinhour is a successful businessman when his disease is in remission, but he hallucinates and suffers from an altered perception of reality when his disease is active.[1] As one might expect, Mr. Cartinhour's illness was a closely guarded secret. It is also worth noting that Mr. Robertson did *not* introduce Mr. Cartinhour's mental health as an issue in *Robertson I*. Instead, Mr. Kearney and Mr. Bramnick first introduced the issue. Specifically, they introduced his *altered* medical records for the purpose of arguing that Mr. Cartinhour was easily manipulated. When

---

[1] Even when the disease is active, a layperson often cannot recognize the fact that someone is in the midst of an episode. *See* Transcript of the May 15, 2013 Testimony of Stephen Raffle, M.D., Ph.D. (Exhibit 2), pp.43-44.

Mr. Cartinhour was questioned under oath about his medical condition, he testified that he suffered from esophageal spasms, hypothermia, and anxiety, but he never mentioned the fact that he suffered from schizophrenia. *See* March 26, 2010 Hearing Transcript (Exhibit 3), pp. 113-114, 119; *see also* March 22, 2010 Hearing Transcript Excerpt (Exhibit 4) and January 31, 2011 Deposition Transcript (Exhibit 5), pp. 6-8. Likewise, in his sworn responses to interrogatories, Mr. Cartinhour concealed the fact that he suffered from paranoid schizophrenia, *see* Response to Interrogatory No. 22 (Exhibit 6), even though he would have known that he was being treated for schizophrenia. *See* Transcript of May 15, 2013 Testimony of Stephen Raffle, M.D., Ph.D. (Exhibit 1) pp. 44-46.[2]

Mr. Cartinhour's attorneys are fairly sophisticated, with the possible exception of Mr. Bloom, who has always been a sole practitioner and low-level generalist. Mr. Bramnick seems to be one of the central figures, and perhaps the lynchpin. Although he was only an associate, the evidence tampering and discovery fraud all seem to trace back to him. Moreover, it appears that he was responsible for bringing Mr. Yuzek, Ms. O'Donnell, and Mr. Bloom into *Robertson II*, as Ms. O'Donnell and Mr. Bloom were his classmates at Washington School of Law at American University. I suspect that there is some sort of personal connection between Mr. Bramnick and Judge Huvelle, mainly because she has been so protective of him, but right now that is only suspicion.

ROBERTSON I

Mr. Robertson filed *Robertson I* in 2009 as a result of a dispute with Mr. Cartinhour over their partnership, W.A.R., LLP, and the case was assigned to Judge Huvelle. Mr. Robertson was originally represented by attorney Ed Griffin of Maryland. I became involved in early 2010 after I concluded that Judge Huvelle was trying to railroad Mr. Robertson. From the outset, Judge Huvelle was extremely hostile. While hostility is not a crime, her conduct appears increasingly suspicious in retrospect, particularly in light of the newly discovered *ex parte* communications. For example, at the December 15, 2009 initial scheduling conference, with nothing more than the pleadings in front of her, Judge Huvelle suggested that Mr. Robertson was a "rat," stating as follows: "I mean, I have not sat on the bench for all these years and not got a sixth sense of a rat." December 15, 2009 Transcript, p. 5. (Exhibit 7). She then declared – without having heard any evidence, and never mind the fact that Mr. Robertson had demanded a jury trial – that she was going to award the disputed funds to Mr. Cartinhour ("We're going back to Go; get it back to him"). *Id*. at 10. Finally, she froze all of Mr. Robertson's assets *sua sponte*, without notice or an opportunity to respond, and without any pretense of following the laws regarding pre-judgment seizures of assets.

---

[2]  It should come as no surprise that a paranoid schizophrenic and a pathological liar would lie about whether he is a paranoid schizophrenic and a pathological liar, but Mr. Kearney and Mr. Bramnick had an unequivocal professional duty to disclose his perjury and frauds on the court. *See, e.g.*, D.C. Rule of Professional Conduct 3.3.

The first clear evidence of criminal activity came to light on March 26, 2010, when Mr. Cartinhour implicated his attorneys in the fabrication of an affidavit. Mr. Cartinhour was questioned about the affidavit by Mr. Griffin. As you probably know, all documents are filed electronically in federal court, therefore Mr. Griffin only had a printout of the affidavit that Mr. Bramnick had scanned and filed electronically. Mr. Cartinhour testified under oath that he had no knowledge of the facts alleged in the affidavit, that he had never seen it before, and that someone had used "some sort of technology" to put his signature on the affidavit. *See* March 26, 2010 Hearing Transcript (Exhibit 4).[3] In other words, he testified that the affidavit was a forgery. In response, Judge Huvelle did absolutely nothing.

Shortly thereafter, Mr. Griffin discovered that Mr. Cartinhour had lied in some of his discovery responses in order to conceal the identity of an adverse witness (*i.e.*, attorney Larry Ash), and that Mr. Cartinhour's attorneys knew the answers were false when they provided them to Mr. Griffin. In his claims against Mr. Robertson, Mr. Cartinhour had averred that he never consulted with an independent attorney but had instead relied on legal advice from Mr. Robertson about forming the partnership with Mr. Robertson. However, Mr. Griffin learned that (1) Mr. Cartinhour had consulted with Mr. Ash about the partnership and (2) Mr. Ash advised Mr. Cartinhour *against* forming the partnership, but (3) Mr. Cartinhour did it anyway. *See* July 14, 2010 Deposition of Larry Ash (Exhibit 8), pp. 17-23; *see also* February 1, 2011 Deposition of William C. Cartinhour, Jr. (Exhibit 9), pp. 120-123 (where Mr. Cartinhour admits that he should have disclosed Mr. Ash's identity). Mr. Griffin also obtained e-mails exchanged between Mr. Ash and Mr. Bramnick wherein Mr. Ash disclosed the fact that he had consulted with Mr. Cartinhour. *See* E-mails between Michael Bramnick and Larry Ash (Exhibit 10). Thus Mr. Bramnick knew that Mr. Cartinhour's interrogatory responses were false when he submitted them to Mr. Griffin.

When Mr. Griffin tried to bring this to Judge Huvelle's attention, she not only expressed no interest, *she threatened to sanction Mr. Griffin*. Specifically, when Mr. Griffin said he intended to file a motion for sanctions based on the perjury and fraud, Judge Huvelle threatened to sanction Mr. Griffin instead of the perpetrators. *See* Excerpt of July 22, 2010 Status Hearing Transcript (Exhibit 11). Not surprisingly, Mr. Griffin decided not to file the motion for sanctions.

On February 8, 2011, on the eve of trial, I attempted to enter an appearance alongside Mr. Griffin in *Robertson I*. By that point, Mr. Griffin seemed intimidated by Judge Huvelle, and not without reason. I intended to force Judge Huvelle to confront the crimes that were committed in her court, and at the February 8, 2011 hearing I told her as much. As you can see from the transcript, however, Judge Huvelle made it clear that she was not interested in those matters, and she blocked me from entering an appearance on behalf of Mr. Robertson. *See* February 8, 2011 Transcript, pp. 9-12 (Exhibit 12).

---

[3] As set forth below, recently-obtained billing records from Mr. Bramnick and Mr. Kearney support the allegation that someone forged Mr. Cartinhour's signature on the affidavit. Specifically, Mr. Cartinhour met with the attorneys shortly before the affidavit was drafted but did not meet with them again until after the affidavit was filed. So when would he have signed the affidavit?

ROBERTSON II

Meanwhile, I separately filed *Robertson II* in the U.S. District Court for the Southern District of New York, where it was assigned to Judge Laura Swain. Among other things, *Robertson II* described the criminal misconduct in Judge Huvelle's court, although it did not mention Judge Huvelle by name. Dean Yuzek, a partner at Ingram Yuzek Gainen Carroll & Bertolotti, LLP, soon called me on behalf Mr. Cartinhour. Interestingly, Mr. Yuzek admitted from the outset that he had not spoken directly to his purported client, but only through "intermediaries."

I told Mr. Yuzek during the phone conversation that I was concerned that the intermediaries were none other than Mr. Kearney and Mr. Bramnick, and I explained that they had serious conflicts of interest with Mr. Cartinhour, not least of which was the fact that they were his co-defendants in the New York case. Mr. Yuzek never identified the intermediaries during the conversation, and I later sent an e-mail to Mr. Yuzek and his associate, Cherish O'Donnell (now Cherish Benedict), restating my concerns. *See* December 28, 2010 E-mail from Ty Clevenger to Cherish O'Donnell (Exhibit 13). Even though I did not know about Mr. Cartinhour's schizophrenia at that time, I had already begun to suspect that Mr. Cartinhour was being exploited by Mr. Kearney and Mr. Bramnick. For one thing, Mr. Robertson had offered to settle with Mr. Cartinhour in *Robertson I*, but Mr. Kearney responded with a counter-offer that would require Mr. Robertson to dismiss all claims against Mr. Kearney and his law partners in *Robertson II*. *See* November 24, 2010 Letter from Patrick Kearney to Edward Griffin (Exhibit 14).

As I noted in my first e-mail to Mr. Yuzek, Mr. Kearney had a serious conflict of interest in making settlement of Mr. Cartinhour's claims contingent on a release of claims against Mr. Kearney and his law partners. *See* November 30, 2010 E-mail from Ty Clevenger to Dean Yuzek (Exhibit 15). Mr. Kearney admitted that Mr. Cartinhour had not seen the counter-proposal, although he claimed that Mr. Cartinhour had "approved the major terms." *See* Exhibit 14. There are a couple of problems with that admission. First, given the conflict of interest, a passing familiarity with the counter-proposal was grossly inadequate. Mr. Kearney was required by the rules of professional conduct to advise Mr. Cartinhour to seek independent legal counsel regarding the counter-proposal, *i.e.*, whether Mr. Kearney should be able to condition settlement of Mr. Cartinhour's claims on a release of claims against Mr. Kearney in another case. *See* D.C. Rule of Professional Conduct 1.8(a). Obviously, any unbiased attorney would have advised Mr. Cartinhour to tell Mr. Kearney to get lost.

Second, in light of the subsequent revelations about Mr. Cartinhour's schizophrenia, it is doubtful that Mr. Cartinhour had the presence of mind to consent to Mr. Kearney's counter-proposal, because the evidence now indicates that Mr. Cartinhour was actively schizophrenic *at the time the counter-offer was made*.[4]

---

[4] It is also doubtful that Mr. Cartinhour had the capacity to form an attorney-client relationship with Mr. Yuzek and Ms. O'Donnell. Under the law of all U.S. jurisdictions, an attorney-client relationship cannot be

Moreover, it appears that both the D.C. and New York courts were deceived regarding Mr. Cartinhour's medical condition. In a November 30, 2010 letter to Judge Swain, Mr. Yuzek claimed that he could not speak directly with Mr. Cartinhour because his purported client was suffering from "severe heart problems." *See* November 30, 2010 Letter from Dean Yuzek to Judge Laura Swain (Exhibit 16). That letter falsely claimed that Mr. Cartinhour's medical condition had been documented for the court in D.C., when in reality the only "evidence" before the D.C. court was Mr. Kearney's motion.

Mr. Yuzek initially agreed to produce evidence documenting Mr. Cartinhour's medical condition, but he later reneged, probably because he had discovered by then that Mr. Cartinhour was suffering from severe mental illness instead of heart problems. Meanwhile, Mr. Kearney and Mr. Bramnick sought a continuance of the trial date in *Robertson I* by portraying Mr. Cartinhour as suffering from "severe heart problems" that "could kill him", *see* Defendant / Counter-Plaintiff's Emergency Motion to Continue Trial (Exhibit 17), but it now appears that Mr. Cartinhour was instead having a schizophrenic episode.[5] When Mr. Griffin objected to the continuance and requested proof of Mr. Cartinhour's medical condition, Judge Huvelle became particularly hostile. *See* November 29, 2010 Transcript, D.D.C. Case No. 09-cv-1642 at pp.3-4, 6 (Exhibit 19). However, Mr. Cartinhour himself later repudiated the idea that he was incapacitated by heart problems. In lieu of testifying at trial, Mr. Cartinhour was deposed *de ben esse*, and he testified that he was suffering from hypothermia and some throat problems, but he denied that he had any heart problems. *See* February 1, 2011 Trial Deposition Transcript (Exhibit 9), pp. 244-247, 275-276.

That deposition is particularly telling. In a forthcoming civil lawsuit, I plan to present expert testimony that Mr. Cartinhour was manifesting schizophrenic symptoms *during* his videotaped testimony. Apparently he had recovered from his previous episode just enough to appear elderly and confused – or perhaps a little eccentric – when in reality he was legally insane and not competent to testify, a fact known to Mr. Kearney and Mr. Bramnick.

Mr. Cartinhour's psychiatrist, Dr. Stanley Slater, later told Mr. Robertson that he had informed Mr. Cartinhour's attorneys and "the court" about Mr. Cartinhour's

---

formed where the client is impaired by severe mental illness, and even where an attorney-client relationship has already been formed, it is suspended or terminated as a matter of law when the client is incapacitated by the illness. *See Donnelly v. Parker*, 486 F.2d 402, 407 n. 20 (D.C. Cir. 1973); *Matter of Kern*, 627 N.Y.S.2d 257 (N.Y.Sup. 1995); *Quinn v. Quinn*, 83 S.W.2d 269 (Tenn. 1935); *Sullivan v. Dunne*, 244 P. 343 (Cal. 1926); and *Gillet v. Shaw*, 83 A. 394, 396 (Md. 1912). If the client becomes incapacitated by mental illness, even the opposing party has a duty to notify the court of that fact, and to seek the appointment of a guardian ad litem. *See, e.g., In re Lisa M.,* 177 Cal.App.3d 915, 919 (Cal.App.1.Dist. 1986) and *Olivera v. Grace*, 122 P.2d 564, 568 (Cal. 1942). Failure to disclose such information is a fraud on the court. *Olivera,* 122 P.2d at 568. In this case, all of the Maryland and New York attorneys have an ongoing incentive to conceal Mr. Cartinhour's illness, because otherwise they must admit that they prosecuted the cases without authority and perpetrated a fraud on the court.

[5] Mr. Cartinhour did visit an internal medicine clinic about alleged heart problems, but the clinic sent him home and advised him to follow up with a cardiologist. *See* Note from David E. Rogers, M.D., Affidait of David E. Rogers, M.D., and Affidavit of Pasquale Santini, M.D. (collectively attached as Exhibit 18). That's a far cry from "severe heart problems" that "could kill" Mr. Cartinhour.

schizophrenia. *See* February 24, 2014 Declaration of Wade Robertson (Exhibit 20). Dr. Slater has since refused to speak with Mr. Robertson or with me, but the only possible court to which he could have referred is Judge Huvelle's court.[6] Yet nobody ever bothered to tell Mr. Robertson or his attorneys, or to disclose this information in open court.

THE FRAUD ON THE NEW YORK COURT

When I sent my December 28, 2010 e-mail to Mr. Yuzek and Ms. O'Donnell, I did not yet know that Mr. Cartinhour was a paranoid schizophrenic. Nonetheless, I stated my concern that someone was "pulling the strings" with respect to Mr. Cartinhour. *See* Exhibit 7. In response, Mr. Yuzek got rather thin-skinned about my repeated requests that he show proof of his authority to represent Mr. Cartinhour:

> Your purported issue regarding my firm's authority to represent Dr. Cartinhour is without merit, and the Court has already signaled you regarding its negative view of this line of inquiry. Although the nature and extent of my firm's communication with Dr. Cartinhour is none of your business, we have spoken with him directly and have been duly retained by him. We do not intend further to discuss this non-issue with you.

*Id*. After that e-mail, I quit pushing the issue. In retrospect, that was a mistake. I later obtained Mr. Yuzek's billing records, and those records show that Yuzek lied to me. According to those records, Yuzek did not speak to his purported client until January 7, 2011, *i.e.*, ten days after the December 28, 2010 e-mail wherein he claimed that he had already spoken "directly" with Mr. Cartinhour. *See* Billing Records of Dean Yuzek and Cherish O'Donnell (Exhibit 22). And, as noted above, it now appears that Mr. Cartinhour was actively schizophrenic during the time of his alleged conversation with Mr. Yuzek.

According to Mr. Yuzek's billing records, the "intermediaries" who hired him and gave him his marching orders were none other than "Mike B." and "Carl O.," *i.e.*, Michael Bramnick and Carlton Obecny. *Id*. That meant Mr. Yuzek was taking orders from Mr. Cartinhour's co-defendants rather than Mr. Cartinhour, even though I had expressly warned Mr. Yuzek and Ms. O'Donnell about the conflicts of interest between Mr. Cartinhour and those co-defendants. According to their own billing records, Mr. Yuzek and Ms. O'Donnell communicated primarily with Mr. Kearney and Mr. Bramnick and did not speak to their purported client for as long as *fifteen months*. *Id*. Moreover, their own records suggest that Cartinhour refused to pay his bill from their firm, most likely because he never authorized the firm to represent him in the first place.

---

[6] In 2013, Dr. Slater openly discussed Mr. Cartinhour's schizophrenia with both Mr. Robertson and me via telephone. However, when Dr. Slater was asked about Mr. Cartinhour's mental illness during a 2010 deposition for *Robertson I*, he said absolutely nothing about schizophrenia. *See* Transcript of Deposition of Stanley Slater (Exhibit 21).

Mr. Kearney later admitted that his firm was paying the bills from Mr. Yuzek's firm, although Mr. Kearney claimed that he was using money from a trust account that belonged to Mr. Cartinhour.  Even so, it appears that Mr. Kearney was taking money from his incapacitated client to advance his own interests.  The bottom line is that Mr. Yuzek and Ms. O'Donnell were retained and paid by – and took their orders from – Mr. Kearney's firm, even though they knew that Mr. Kearney, et al. had gross conflicts of interest with Mr. Cartinhour.  In light of the evidence that all of the attorneys knew that Mr. Cartinhour was legally insane, it appears that Mr. Yuzek and Ms. O'Donnell perpetrated a fraud on Judge Swain's court, portraying themselves as representing the interests of Mr. Cartinhour when in reality they were hired and paid by the Maryland attorneys to represent the interests of the Maryland attorneys.

BACK TO D.C.

Meanwhile, back in D.C., Judge Huvelle forged ahead with trial and Mr. Cartinhour won a $7 million jury verdict, largely based on his own testimony. Of course, the jurors were never told that Cartinhour was a paranoid schizophrenic who is pathologically prone to dishonesty, because that information was concealed from Mr. Robertson and his attorneys.  And even if one believes that the $7 million verdict was the right result, my client was nonetheless denied a fair trial because of the fraud, perjury, and obstruction of justice.

On October 28, 2011, Judge Swain transferred the New York case to D.C., where the case was randomly assigned to Judge John Bates.  The attorneys representing Mr. Kearney, et al. quickly filed a motion to transfer the case from Judge Bates to Judge Huvelle or Judge Royce Lamberth.  *See* November 17, 2011 Motion to Transfer Assignment of Case (Exhibit 23). In that motion, the attorneys noted that Mr. Robertson consented to transferring the case to Judge Lamberth, but he objected to transferring the case to Judge Huvelle. *Id*. According to Local Rule 7(b), I had 14 days to file a written response explaining why Mr. Robertson objected to transferring the case to Judge Huvelle.

The transfer motion was supposed to go to the local calendars committee, which was chaired by none other than Judge Huvelle.  On the sixth day, *i.e.*, before I had an opportunity to file the written response, Judge Huvelle used her position as chairwoman to assign the case to herself, *see* November 23, 2011 Reassignment of Civil Case (Exhibit 24), and she did so in violation of the local rules. It does not appear that the matter was presented to the full committee, and the committee certainly was not made aware of Judge Huvelle's conflicts of interest, *e.g.*, the fact that *Robertson II* involved evidence that she misprisioned felonies in *Robertson I*.  *See, e.g., Suntrust Mortg., Inc. v. Busby*, 2009 WL 4801347, *3 (W.D.N.C. 2009) (citing 18 U.S.C. § 4). In other words, Judge Huvelle apparently did not tell the committee that she was assigning herself to a case that implicated her in a crime.

On February 24, 2012, I filed a motion to disqualify Judge Huvelle from *Robertson II*, and the motion included documentary evidence of her conflicts of interest and judicial misconduct. See Plaintiff's Motion to Recuse Pursuant to 28

U.S.C § 455, with internal exhibits (Exhibit 25).  Not surprisingly, Judge Huvelle refused to disqualify herself, then dismissed *Robertson II* with prejudice.  Mr. Kearney and Mr. Bramnick then entered appearances, purportedly on behalf of Mr. Cartinhour, and filed a motion for sanctions against me, asking Judge Huvelle to order me to pay all of the bills from Mr. Yuzek's and Ms. O'Donnell's firm.

I demanded a copy of the firm's billing records as well as proof that Mr. Cartinhour had actually hired them or authorized them to represent him, but the lawyers only provided redacted billing records. I showed Judge Huvelle that the law required them to produce unredacted billing records and, to her credit, Judge Huvelle ordered them to produce unredacted billing records. *See* Dean Yuzek and Cherish O'Donnell Billing Records (Exhibit 22). However, she refused to make Mr. Yuzek and Ms. O'Donnell produce any proof (*e.g.*, a retainer agreement) that Mr. Cartinhour had actually hired them.

To this day, there is no proof that Mr. Cartinhour authorized Mr. Yuzek and Ms. O'Donnell to represent him, or that he even knew about what they were purporting to do on his behalf. In fact, all of the evidence available thus far shows that Mr. Kearney's law firm hired Mr. Yuzek and Ms. O'Donnell, gave them directions, and paid Yuzek and O'Donnell, even though every lawyer involved knew that there were serious conflicts of interest between Mr. Cartinhour and his co-defendants, *i.e.*, Mr. Kearney and the other Maryland lawyers. After all, Mr. Kearney had already tried to make settlement of Cartinhour's claims contingent on the release of all claims against Mr. Kearney.  Nonetheless, Judge Huvelle sanctioned me $123,802.17, supposedly to reimburse Mr. Cartinhour for attorney fees paid to Mr. Yuzek's firm.

NEW EVIDENCE

In 2012, an attorney filed a grievance against me with the State Bar of Texas, citing Judge Huvelle's sanctions order, among other things.  As strange as it may sound, I actually encouraged the state bar to file charges against me, because I wanted to serve subpoenas on the attorneys in Maryland (as well as the attorney who filed the bar grievance). You can verify this by calling Dirrell Jones, the prosecutor for the State Bar of Texas, at 972-383-2908.  After the charges were filed in Texas, I filed a special proceeding in Maryland and served subpoenas on the Maryland attorneys. Among other things, I demanded to see the original version of the affidavit that Mr. Cartinhour had repudiated as a forgery.

Mr. Kearney and his law firm fought fiercely to keep me from seeing the original affidavit.  Nonetheless, on December 19, 2013, Judge Michael D. Mason of the Circuit Court of Montgomery County ordered Mr. Kearney's law firm to produce the original copy of the affidavit for my inspection.  On Christmas Eve, Mr. Kearney filed a document in the Montgomery Circuit Court admitting that the original affidavit could not be produced, but he claimed that the original really did exist at one time. *See* December 24, 2013 Line (Exhibit 26). However, Mr. Kearney and all of his colleagues consistently refused to make that statement under oath, despite my repeated requests.

At one point, Mr. Kearney even implied that I was to blame for his inability to produce the original affidavit, suggesting that I should have asked to see it sooner. In reality, I had sent a spoliation letter within six months of Mr. Cartinhour's testimony, demanding the preservation of evidence. *See* September 2, 2010 Letter from Ty Clevenger to Alvin Frederick (Exhibit 27). Regardless, the rules of the federal court obligated Mr. Kearney to preserve the original copy of the affidavit. Moreover, it should be obvious to any attorney that he had better preserve the original document when his own client implicates him in electronically filing a forgery. Finally, and most importantly, the affidavit *looks* like a forgery, even to a layperson: notice how the signature appears on a separate page from the body of the affidavit (even though there was plenty of room for the signature line). *See* Exhibit 26. It looks as if someone electronically cut and pasted Mr. Cartinhour's signature, just as Mr. Cartinhour himself had testified.

As part of the Maryland proceeding, I also obtained records indicating that Judge Huvelle had exchanged messages with Mr. Kearney and Mr. Cartinhour via a third party. Ironically, they had exchanged messages about whether Mr. Cartinhour would allow someone to co-sign his checks in lieu of appointing a guardian. *See* February 27, 2014 Motion to Compel Responses to Interrogatories, along with internal exhibits (Exhibit 28) and February 27, 2014 Motion to Compel Stanley L. Slater to Testify and Produce Documents, along with internal exhibits (Exhibit 29).[7] This, of course, caused me to wonder how much she knew about Mr. Cartinhour's mental illness, and where she got her information. At a hearing on June 25, 2014, after the e-mails came to light, Mr. Kearney downplayed the *ex parte* communications, but he admitted that "it probably should not have happened."[8] Another e-mail revealed that Judge Huvelle was aware of the payment arrangements between Mr. Cartinhour and the Maryland attorneys, *see* June 16, 2011 E-mail from Judge Huelle to Philip O'Donoghue (Exhibit 31), yet none of that information had been discussed in open court. If Dr. Slater communicated directly with Judge Huvelle, that means she communicated *ex parte* at least three times,[9] although I suspect there were other instances that have not yet been disclosed.[10]

---

[7] Judge Huvelle asked Maryland attorneys Philip O'Donoghue and Rob Grant to evaluate whether Mr. Cartinhour might need a guardian. They found no need for a guardian, but Mr. Grant testified that no one ever told him about Mr. Cartinhour's schizophrenia. See Transcript of September 26, 2013 Deposition of Rob Grant (Exhibit 30), p. 10. If Dr. Slater informed Judge Huvelle about Mr. Cartinhour's schizophrenia, as Dr. Slater suggested, then you would think that she would have shared that information with Mr. O'Donoghue and Mr. Grant. Frankly, I am not sure what to believe.

[8] I am awaiting a copy of the transcript of this hearing, and I will be glad to provide you with a copy after I receive it.

[9] I have serious doubts about Dr. Slater's credibility. During a deposition for *Robertson I*, he failed to disclose the schizophrenia, even when he was asked questions that were pertinent to Mr. Cartinhour's schizophrenia. *See* Transcript of Deposition of Stanley Slater (Exhibit 21). And his own testimony contradicts his subsequent statements to Mr. Robertson and to me. Moreover, if Mr. Cartinhour's medical records were first sent to Mr. Cartinhour's attorneys instead of Mr. Griffin, that means Dr. Slater violated the plain terms of the subpoena, which required him to send the records to Mr. Griffin. Taken together, it appears that Dr. Slater was a willing participant in the scheme to conceal Mr. Cartinhour's mental illness. While I do not doubt that Dr. Slater thought he was doing a good deed for his client, his good intentions would not excuse perjury or obstruction of justice.

I asked the Maryland court for permission to depose Mr. Kearney, et al. about who scanned the affidavit, who witnessed its signing, who last saw the original, etc., but my request was denied. Nonetheless, Mr. Jones ended up dismissing all state bar charges that were based on Judge Huvelle's accusations against me. I obviously cannot speak for Mr. Jones, but I encourage you to speak with him yourselves. I believe he would tell you that he was very skeptical of my claims in the beginning, but in time he changed his mind.

As I was finalizing this letter, I obtained copies of billing records suggesting that Mr. Bramnick had intercepted psychiatric records that were supposed to be produced directly to Mr. Griffin in response to a subpoena from the *Robertson I* court. According to Mr. Bramnick's billing records, he reviewed Mr. Cartinhour's psychiatric records on the day *before* they were sent to Mr. Griffin. *See* Bramnick / Kearney Billing Records (Exhibit 32). According to FedEx records, the psychiatric file was then sent from a dropbox near Mr. Bramnick's office, which is not near the psychiatrist's office. *See* FedEx Records (Exhibit 33).

The psychiatric records produced to Mr. Griffin did not contain any reference to Mr. Cartinhour's schizophrenia, much less the fact that Mr. Cartinhour had been hospitalized for years at a time.[11] *See* Declaration of Ed Griffin (Exhibit 34) and its internal exhibits. When Mr. Robertson later compared those records to a more complete version, he realized that the first version had apparently been altered to remove all references to schizophrenia and hospitalization. In other words, it looks like Mr. Bramnick directed the psychiatrist to produce the records to him rather than Mr. Griffin, then Mr. Bramnick tampered with the evidence before sending it via FedEx to Mr. Griffin.

The most damning evidence in the billing records, however, may be the billing entries regarding the allegedly fabricated affidavit. Those records indicate that the attorneys met with Mr. Cartinhour shortly before the affidavit was drafted, but they did not meet with him again until after the affidavit was filed. In other words, it appears that Mr. Cartinhour never came by their office to sign the purported affidavit, which would tend to support his testimony that someone used "some sort of technology" to put his signature on the affidavit.

Around the same time, in response to a misconduct complaint, Mr. Bramnick and Mr. Selzer wrote the following excerpt to the State Bar of Florida:

---

[10] Judge Huvelle always seemed to be aware of things that were not disclosed in court nor in the record. During one hearing, for example, she stated that she did not want Mr. Robertson running away to Brazil. Perhaps she was just alluding to Brazil's commonly-known non-extradition policy, but Mr. Robertson had recently booked a flight to visit Glen Freiberger, a Stanford classmate who lives in Brazil (they visit one another regularly). Around the same time, Judge Huvelle had conducted her own extrajudicial investigation into Mr. Robertson's finances, put her findings into an exhibit, then accepted it as evidence against Mr. Robertson (her exhibit was later proven wrong). In short, she always wanted to be the investigator and the prosecutor as well as the judge.

[11] The first version did contain a diagnosis code that turned out to be the code for schizophrenia, but the string of numbers is meaningless to the average layperson.

> Cartinhour is an 82-year-old man in poor health which requires him to take a variety of medications on a regular basis. He suffers from heart related problems, esophogeal spasms, hypothermia, anxiety and a number of other physical and social conditions. He lives alone in a studio apartment in Rockville, Maryland.

July 28, 2010 Letter from Michael Bramnick and Robert Selzer to Theodore Littlewood (Exhibit 35). As usual, they portrayed Mr. Cartinhour as someone who was in poor health and easily manipulated, but they withheld the fact that he suffered from chronic schizophrenia, *id.*, even though they would have known about the schizophrenia at the time they sent the letter. *See* Exhibit 32.

Similarly, Mr. Kearney would have known about the schizophrenia at the time of Mr. Cartinhour's January 31, 2011 deposition (Exhibit 5), yet Mr. Kearney did nothing to correct Mr. Cartinhour's false testimony, even though the professional rules obligated him to take corrective action. According to the transcript of a February 24, 2011 hearing, Mr. Kearney told Judge Huvelle that he had spoken twice with Mr. Cartinhour's psychiatrist (which would seem to comport with Dr. Slater's statement that he told "the attorneys" about Mr. Cartinhour's schizophrenia), yet Mr. Kearney did not disclose the schizophrenia at the hearing, even though Judge Huvelle was questioning whether Mr. Cartinhour was competent to manage his own money. *See* Excerpt of February 24, 2011 Hearing Transcript (Exhibit 36).

On April 26, 2011, Mr. Kearney filed a motion informing the Court that he had again spoken with Dr. Slater:

> The undersigned has spoken at length with Cartinhour on the subject of the Court's concerns and has spoken to his psychiatrist, Dr. Stanley Slater. Having conducted an investigation, the undersigned is not able to advocate that Cartinhour lacks capacity to make his own financial decisions. The undersigned is aware of no fact that would indicate that Cartinhour would squander or give away any recovery in this case, including the money currently held in the Registry of the Court.

*See* Memorandum in Support of Motion for Order Releasing Funds from the Registry of the Court (Exhibit 37). This contradicts Dr. Slater's claim that he told Mr. Kearney that Mr. Cartinhour's schizophrenia could impair his ability to make financial decisions. Finally, when Mr. Kearney was questioned under oath about Mr. Cartinhour's mental illness at an April 10, 2013 hearing in California, he acted as if he was unaware of the schizophrenia. *See* April 10, 2013 Hearing Transcript Excerpt, pp. 172-183 (Exhibit 38). Note in particular the evasive answers that Mr. Kearney gave on pages 174-175. Either way, Mr. Kearney was clearly made aware of the schizophrenia during that hearing, yet he made no attempt thereafter to correct the false testimony or the fraud on the court as required by D.C. Rule of Professional Conduct 3.3.

I have previously warned the New York and Maryland attorneys that, regardless of the exact date when they learned about Mr. Cartinhour's schizophrenia, they all have an ongoing duty to disclose any frauds on the court perpetrated by their colleagues or their purported client. *See* April 7, 2014 Letter from Ty Clevenger to Dean Yuzek (Exhibit 39) and December 8, 2014 Letter from Ty Clevenger to Jeffrey Bloom (Exhibit 40). I would particularly direct your attention to my December 8, 2014 letter, which explained that all of these attorneys have a legal obligation to disclose any frauds related to Mr. Cartinhour's mental illness. *Id*. Thus far they have all remained silent.

I should also note some circumstantial evidence that Judge Huvelle intervened with the U.S. District Court for the District of Columbia Grievance Committee in order to block an investigation of the Maryland attorneys.  I filed the grievance against Mr. Bramnick, Mr. Kearney, and Mr. Selzer in 2010 based on Mr. Cartinhour's allegation that the affidavit had been forged, as well as the evidence that the attorneys tried to conceal the identity of the adverse witness, Mr. Ash.  Mr. Robertson spoke with a deputy clerk about my grievance, and the clerk said that the committee would need to speak with Judge Huvelle since the grievance related to a case that was pending in her court.  Shortly thereafter the grievance was dismissed, apparently without any investigation by the committee. *See* December 10, 2010 Letter from Grievance Committee to Ty Clevenger (Exhibit 41).  Given Judge Huvelle's tendency to act *ex parte*, I have to wonder whether she intervened with the grievance committee.

There are other "red flags" too numerous to mention here, *e.g.*, the fact that Judge Huvelle falsely accused me of filing a bankruptcy case for an improper purpose, then refused to correct her order after I pointed out that another attorney had filed the bankruptcy case *against* my client.  I hope to gather more evidence after the civil case is filed against Mr. Kearney, et al., but time is not on my side.  The limitations period for criminal prosecution will soon expire for some of the incidents that I described above.

There is another reason why I am requesting the involvement of your respective offices.  In 2010, I reported my concerns to the U.S. Attorney's Office in D.C., which forwarded the matter to the U.S. Attorney's Office in Maryland, where the case was closed (apparently without any investigation). The evidence was not as well developed at the time, but frankly I doubt the USAOs wanted to initiate an investigation when a local district judge had shown such a strong interest in protecting the perpetrators. Regardless of whether Judge Huvelle has done anything worthy of prosecution, I am quite sure that the attorneys have committed serious crimes, and I remain concerned that Judge Huvelle will try to protect them lest her role be further exposed. On the other hand, if the attorneys were facing criminal charges, they might very well give up what they know about Judge Huvelle in exchange for leniency.