**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

**Edward Butowsky,**

    Plaintiff,

**v.**

**Michael Gottlieb, et al.,**

    Defendants

**Case No. 4:19-cv-00180-ALM-kpj**

**NOTICE OF SUPPLEMENTAL EVIDENCE**

# **Exhibit A**

```
 1              IN THE UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF TEXAS
 2                     SHERMAN DIVISION

 3

 4

    EDWARD BUTOWSKY,
 5
         Plaintiff,
 6
    -vs-                        CASE NO.: 4:18-cv-00442-ALM
 7
    DAVID FOKENFLIK, ET AL.,
 8
         Defendants.
 9    _____/

10

11         VIDEOTAPED DEPOSITION OF DEBORAH SINES

12

13  DATE:                 March 20, 2020

14
    TIME:                 Commenced:  10:19 a.m.
15                        Concluded:  1:35 p.m.

16
    LOCATION:             Southern Reporting Company
17                        145 City Place
                          Suite 302
18                        Palm Coast, Florida  32164

19
    STENOGRAPHICALLY      Mykel Miller, RPR, FPR
20  REPORTED BY:          Notary Public - State of Florida

21

22

23

24

25
```

```
 1   APPEARANCES:

 2

 3       TY O. CLEVENGER, ESQUIRE (Appearing via Zoom)
         The Law Office of Ty Clevenger
         Post Office Box 20753
 4       Brooklyn, New York 11202
         202-577-8606
 5       Tyclevenger@yahoo.com

 6       On Behalf of the Plaintiff

 7

 8       DAVID H. HARPER, ESQUIRE (Appearing via Zoom)
         Haynes and Boone, LLP
         2323 Victory Avenue
 9       Suite 700
         Dallas, Texas 75219
10       214-651-5247
         David.harper@haynesboone.com
11
         LAURA L. PRATHER, ESQUIRE (Appearing via Zoom)
12       Haynes and Boone, LLP
         600 Congress Avenue
13       Suite 1300
         Austin, Texas 78701
14       512-867-8476
         Laura.prather@haynesboone.com
15
         On Behalf of the Defendants
16

17

18   ALSO PRESENT:
     Hunter Matheson, Videographer

19
                        STIPULATION
20
             It is hereby stipulated and agreed by and
21   between counsel present at this deposition and by the
     deponent that the witness review of this deposition
22   would be reserved.

23

24   (This transcript is the product of the court reporter
     and should not be reproduced and given free of charge to
25   any party unless under the direction, control and/or
     supervision of the certifying court reporter.)
```

Video Deposition of Deborah Sines                                      3

```
1                        I N D E X

2    TESTIMONY OF DEBORAH SINES
```

```
3         Direct Examination by Mr. Clevenger          4
          Cross-Examination by Mr. Harper             72
4         Redirect Examination by Mr. Clevenger      109
          Recross-Examination by Mr. Harper          124
5         Further Redirect Examination by Mr. Clevenger  125

6

     CERTIFICATE OF OATH                             127
7
     REPORTER'S DEPOSITION CERTIFICATE               128
8
     READ AND SIGN LETTER                            129
9
     ERRATA SHEET                                    130
10
```

```
11

12                    INDEX OF EXHIBITS

13
```

```
     Plaintiff's Exhibit No. 1                        11
14        (Episode 2 - The Russian Connection 7-9-2019)

15   Plaintiff's Exhibit No. 2                        11
          (Episode 5 - Fox News Fallout 7-30-2019 -
16          11:59-14:37)

17   Plaintiff's Exhibit No. 3                        43
          (Office of the Inspector General, U.S.
18           Department of Justice Investigative Summary)

19   Plaintiff's Exhibit No. 4                        48
          (E-mail, dated 8/10/2016)
20
     Plaintiff's Exhibit No. 5                        51
21        (Audio Transcription of Podcast
            "Conspiracyland")
22
     Defendants' Exhibit No. 6                        74
23        (Affidavit of Deborah L. Sines)

24   Defendants' Exhibit No. 7                       107
          (Remainder of Documents Produced by the
25          Witness)
```

Video Deposition of Deborah Sines

```
 1              THE VIDEOGRAPHER:  We are now on the record

 2         for the video deposition of Deborah Sines taken

 3         in the matter of Edward Butowsky versus David

 4         Fokenflik, et al.

 5              Today is March 20, 2020, and the time is

 6         10:19 a.m.  This deposition is being conducted at

 7         145 City Place, Palm Coast, Florida.  The court

 8         reporter is Mykel Miller, and the videographer is

 9         Hunter Matheson.

10              Will counsel please introduce yourselves for

11         the record after which the court reporter will

12         swear in the witness.

13              MR. CLEVENGER:  Yes.  This is Ty Clevenger

14         for the plaintiff, Edward Butowsky.

15              MR. HARPER:  This is David Harper for the

16         defendants including National Public Radio, David

17         Fokenflik.  And Ms. Laura Prather is listening in

18         by -- by audio -- by Zoom, I guess, to be

19         precise.

20                        DEBORAH SINES,

21         having been first duly sworn, was examined and

22             testified upon her oath as follows:

23                  THE WITNESS:  Yes, I do.

24                  DIRECT EXAMINATION

25    BY MR. CLEVENGER:
```

1      Q.   Good morning, Ms. Sines.  Could you please

2   state your full name on the record?

3      A.   Deborah Lynn Sines.

4      Q.   And I understand you now reside in Florida;

5   is that correct?

6      A.   That's correct.

7      Q.   And you previously were an assistant U.S.

8   attorney in Washington, D.C. --

9      A.   Yes.

10      Q.   -- is that correct?

11      A.   I said "yes."

12      Q.   And I also understand you were -- I'm sorry.

13   Go ahead.

14      A.   I said "yes."

15      Q.   Okay.  And were you assigned as the lead

16   prosecutor on the Seth Rich murder case?

17      A.   Yes.

18      Q.   You produced some documents this morning.  Is

19   it -- is it correct you have 19 pages of documents

20   total?

21      A.   I didn't count the pages, but you have the

22   same copies I do.

23      Q.   Okay.  I would like to go through those

24   briefly.  Who sent you a copy of the order that you've

25   included in those documents?

Video Deposition of Deborah Sines

```
 1        A.   The Department of Justice.

 2        Q.   Who within the Department of Justice?

 3        A.   Dan Van Horn.  Chief of the --

 4        Q.   Okay.

 5        A.   -- Civil Division for the United States

   Attorney's Office for Washington, D.C.

 7        Q.   It looks like it's around the 11th page of

 8   the document that I have -- there's -- looks like a

 9   Friday, July 13, 2018, e-mail at the bottom.  7:07 p.m.

10        A.   No.  That -- that -- I know what you're

11   talking about, but that is a mistake.  I think the

12   July -- let me find the order.  Hold on.

13        Q.   Actually this question was not about the

14   order.  This is a different - --

15        A.   Oh, well.

16        Q.   -- different subject.

17        A.   So we're done with the order?  You asked

18   me --

19        Q.   Yes.

20        A.   -- who sent --

21        Q.   Yes.

22        A.   -- me this, and I told you.  And you said at

23   the bottom it said July.  You were asking me about the

24   order.  You didn't ask me about anything else.  Are you

25   asking me about a different document now?
```

1      Q.   Yes.   I'm asking you about this -- do you

2  know -- actually, do you know if Mr. Van Horn sent that

3  order by e-mail?

4      A.   Yes.

5      Q.   So is that e-mail in here?

6      A.   No.   The Department of Justice's position is

7  that they don't represent me personally, but sending me

8  that order was in their capacity representing me in my

9  former employment.   I've been given very specific

10  instructions about my contact with my former employer in

11  connection with any case, and I've been instructed not

12  to disseminate anything that they have -- any e-mails

13  between me and them because it's in my capacity as they

14  are representing me as a former assistant U.S. attorney.

15  And I know you have Mr. Van Horn's letter.   Well, I know

16  you have it.

17      Q.   Yes.

18      A.   And I also --

19      Q.   Right.

20      A.   -- sent it to you.

21      Q.   Right.   So I want to talk about something

22  unrelated to that.

23      A.   All right.

24      Q.   It looks like on the -- about the 11th page

25  of the documents we were sent, there's a Friday,

Video Deposition of Deborah Sines

```
 1   July 13th, 2018, e-mail.

 2        A.   Okay.  Just a minute.

 3        Q.   And --

 4        A.   Let me find it.

 5        Q.   Sure.

 6        A.   I've got it.

 7        Q.   Okay.  And it looks like, toward the bottom,

 8   it says -- it says:  Several reporters are trying to

 9   contact me about Seth's case, and I have refused to

10   speak with them because I don't want to harm Seth's

11   investigation.

12             Is that correct?

13        A.   Yes.

14        Q.   And then it looks like on the last page --

15   page 19 of what we were provided -- there's another

16   e-mail to Andy Kroll with Rolling Stone where it looks

17   like you were refusing to speak about the case; is that

18   correct?

19        A.   No.  I have to look at the Andy Kroll ones.

20   Hold on.

21        Q.   Sure.  Actually, let me -- let me -- I'll

22   read it --

23        A.   No.

24        Q.   -- because I --

25        A.   I think you've got that wrong.
```

1    Q.   Yeah.  You're -- I -- let me reread it

2  because I think I did get that wrong.  In the second

3  paragraph, it says:  Even though I have refused to speak

4  with -- to other journalists about this case, I'm

5  thinking about talking to you.

6       Is that correct?

7    A.   Yes.

8    Q.   And so what changed between the time that you

9  were refusing to speak to journalists and the time that

10  you spoke to Michael Isikoff?

11    A.   One of the things that changed was that in

12  September of 2018 -- is Mr. Kroll sent me a letter -- a

13  handwritten letter, not typed -- and he said he used to

14  play soccer with Seth Rich.  So I called Aaron Rich

15  because I had refused to talk to anybody.  And I called

16  Aaron Rich, who confirmed that Mr. Kroll did indeed play

17  soccer with his brother.  That's what changed.

18    Q.   Okay.  So did you grant an interview to

19  Mr. Kroll?

20    A.   Yes, I did.

21    Q.   And has that -- has that been published yet?

22    A.   No.

23    Q.   Do you know when it's supposed to be

24  published?

25    A.   No.

1    Q.   Was it?

2    A.   No.  I just know I didn't get on the cover of

3  the Rolling Stone.  That's all I know.

4    Q.   Okay.

5    A.   Mr. Kroll has written several articles, a few

6  about this case, and I've seen those, but that's not --

7  that's not about me.  That's -- you know, that's about

8  him reporting on other things.

9    Q.   Okay.  Did -- did the Department of Justice

10  authorize you to speak to him?

11    A.   No.

12    Q.   Did -- and of course I've mentioned earlier

13  the Michael Isikoff interview, and I'll get into that

14  more in a moment, but did the -- did the Department of

15  Justice authorize you to speak to Michael Isikoff?

16    A.   No.

17    Q.   And when you spoke to Andy Kroll, were you

18  still actively employed at the Department of Justice?

19    A.   I just told you the date when we spoke.

20  You've got the e-mail from April of 2019.  I haven't

21  been an assistant United States attorney since

22  April 30th, 2018.

23    Q.   Okay.  I want to -- I'm going to go ahead

24  and -- it's a little out of order here, but I'm going to

25  go ahead and introduce two exhibits, actually, that NPR

1   has produced.  They're two excerpts of the interview

2   with -- with Michael Isikoff.

3         MR. CLEVENGER:  And I would ask the court

4      reporter to go ahead and hand you those.

5         (Off-the-record discussion.)

6         (Plaintiff's Exhibit Nos. 1 and 2 were

7      marked for identification.)

8   BY MR. CLEVENGER:

9      Q.  If you would just review those and see if

10  those appear to be accurate.

11        MR. HARPER:  And, Ms. Sines -- I would just

12     interject that we do have the audio available, if

13     the witness would -- if she would like to --

14        THE WITNESS:  It's not necessary.  Thank

15     you.

16        Okay.  I've finished the first one.

17  BY MR. CLEVENGER:

18     Q.  Does that appear to be an accurate transcript

19  of your interview with Mr. Isikoff on Episode 2?

20     A.  Yes, it does.

21     Q.  And if you could review the next one, please.

22  Episode 5.

23     A.  Got it.  Finished it.

24     Q.  Does that appear to be -- okay.  Does that

25  appear to be an accurate transcript of Episode 5 or your

 1    portion of it?

 2         A.   Yes, it does.

 3         Q.   Before I ask you about those interviews, I've

 4    overlooked something in the documents that you produced.

 5    I want to go back to that for just a moment.  It looks

 6    like around the 14th page of what I was provided.  It

 7    says:  Affidavit of Deborah L. Sines.

 8         A.   Yes.

 9         Q.   Has that affidavit ever been executed, or is

10    that just a --

11         A.   Yes, it has.  I just don't have a copy of it

12    with my signature.

13         Q.   Okay.  And who was that executed for?

14         A.   Aaron Rich's civil suit case.

15         Q.   Okay.  So --

16         A.   At -- with the approval of the Department of

17    Justice.

18         Q.   I see.  Do you know who asked to -- that you

19    provide that affidavit?  Like, which attorney?

20         A.   I think her name is Meryl.

21         Q.   Would it be Meryl Governski?

22         A.   Yes.

23         Q.   Okay.  And so did you have a phone

24    conversation with her?

25         A.   No.  I had an interview with her.

Video Deposition of Deborah Sines

1   Q.   Oh, an interview?  Was that -- did she come

2  interview you in Florida?

3   A.   Yes.

4   Q.   And was there any kind of a transcript of

5  that interview, or was it just the two of you meeting?

6   A.   There was -- there was another lawyer there

7  with her, but I don't remember his name.  There is no

8  transcript unless someone was secretly recording me, and

9  I doubt that that happened.

10   Q.   When did you have this meeting with them?

11   A.   Let me check one of these e-mails.  I might

12  be able to figure it out.  I'm trying to remember, and

13  the e-mails are not helping me.

14   Q.   Do you know whether you ever exchanged

15  e-mails with Ms. Governski or any of her colleagues?

16   A.   Not about the Seth Rich investigation.  No.

17  I've never exchanged --

18   Q.   What --

19   A.   I've never exchanged any e-mails with her

20  about the Seth Rich investigation.

21   Q.   Have you exchanged e-mails on other subjects?

22   A.   Yes, but not --

23   Q.   What were those other subjects?

24   A.   -- not anything -- in particular, you know,

25  things like, Attached is the affidavit I prepared, or --

 1   things like that.  Nothing of any substance about any

 2   case.

 3        Q.   So when you say, "Attached is the affidavit I

 4   prepared," was she e-mailing you a draft affidavit or

 5   vice versa?

 6        A.   No.  No.  I -- this is my typing -- any typos

 7   in here are mine.  And --

 8        Q.   Okay.

 9        A.   -- I had to run it by the Department of

10   Justice and have them approve it.  So -- so there's --

11   there's -- she -- she didn't prepare anything.  This is

12   my work.

13        Q.   But you're saying that after you drafted this

14   affidavit, you e-mailed it to Ms. Governski?

15        A.   After the department approved the affidavit,

16   then --

17        Q.   Okay.

18        A.   -- I -- I believe I e-mailed her a copy.  I

19   don't know.  I don't have e-mails between her and me,

20   but I know I sent her a signed copy as I did the

21   Department of Justice.  I -- you're asking me -- I don't

22   remember whether this was 2019 -- I think it's 2019.

23   No.  It could be this year.  I -- no, it can't be this

24   year.  Sorry.  We're in March.  It had to be last year.

25        Q.   Well, the reason I ask is you -- you just

1    testified that you have exchanged some e-mails with Ms.

2    Governski, and you said it was not about Seth Rich, but

3    now you're saying that you sent her this affidavit which

4    clearly is about Seth Rich --

5         A.   Which is why I produced it.  If -- if the

6    affidavit -- the -- the e-mail she sent me or that I

7    sent her was for Aaron Rich as a plaintiff in his civil

8    suit.  That's not about Seth Rich.  That's about Aaron

9    Rich.  However, the affidavit I prepared is about Seth

10   Rich, which is why I've produced it to you.

11        Q.   Are you willing to produce the e-mail that

12   you sent to Ms. Governski?

13        A.   The e-mail that she sent to who?  That I

14   sent?  No.  No.  No.  I don't think that's at all

15   responsive, but I have given you what's responsive about

16   Seth Rich.

17        Q.   Well, isn't it true that Aaron Rich's lawsuit

18   is premised largely on things concerning his brother

19   Seth Rich?

20        A.   I -- I -- I can't say that that's what it's

21   about.  I think it's about the treatment he and his

22   family have received from others.

23        Q.   So -- well, forgive me, Ms. Sines, but are

24   you -- are you trying to split hairs here deciding what

25   you will and will not produce?

Video Deposition of Deborah Sines

1     A.   No, sir.  I'm not splitting -- I'm not

2  splitting any hairs.  I -- I feel I've produced

3  everything responsive to your subpoena.

4     Q.   What other e-mail subjects have you

5  communicated with Ms. Governski or any of her colleagues

6  about?

7     A.   I don't think I've sent any e-mails to any of

8  her colleagues.  I believe just when she was arriving to

9  interview me.

10     Q.   So did she e-mail you to set up the

11  interview?

12     A.   She called me to set up the interview, and

13  then I believe -- I don't even think I still have this

14  e-mail.  She e-mailed me with dates, I believe.

15     Q.   Okay.  And so it's your testimony that those

16  would be the only e-mails you've exchanged with Ms.

17  Governski?

18     A.   Yes.

19     Q.   But you're not willing to produce any of

20  those e-mails; is that correct?

21     A.   I -- I don't even know that I have them,

22  Mr. Clevenger.

23     Q.   Well, did you look?

24     A.   No.

25     Q.   Well, if you -- or if you know that you

Video Deposition of Deborah Sines

1    e-mailed this affidavit to Ms. Governski, did you have

2    to pull that up from an e-mail attachment, or did you

3    get it from somewhere else?

4        A.    No.   I had a -- I -- I had a copy of the

5    affidavit I typed up on my computer, and I printed out

6    the affidavit, but I just didn't have a copy with the

7    signature.

8        Q.    So I have what was -- what was discussed with

9    your interview with Ms. Governski?

10       A.    Everything that's in that affidavit.   It was

11   basically a lot of questions about how cooperative her

12   client was during my investigation.   Some of the

13   questions I could not answer because the department, who

14   arranged for the interview, instructed me I couldn't

15   talk to them about certain things.   For example, if

16   someone testifies before the grand jury, even if they

17   have told other people they testified before the grand

18   jury, I am not allowed to confirm that.   If someone has

19   produced documents before the grand jury or otherwise, I

20   am not allowed to talk about that.   And -- and that's

21   after consulting with the Department of Justice.

22       Q.    You said that the Department of Justice

23   arranged the interview.   Do you know specifically who at

24   the Department of Justice was arranging that?

25       A.    I believe what happened was there -- there

Video Deposition of Deborah Sines

```
 1   was a subpoena for a deposition, and Dan Van Horn said,

 2   No.  You -- she can't do that, and I believe the two of

 3   them -- I don't know; I wasn't there -- negotiated, How

 4   about if she does an affidavit instead?

 5        Q.   So did Mr. Van Horn or anyone else at DOJ

 6   know that Ms. Governski would be flying down to Florida

 7   to interview you --

 8        A.   Yes.

 9        Q.   -- about this?

10        A.   Yes.

11        Q.   They did?  That's --

12        A.   Yes.

13        Q.   That's a "yes"?  Okay.

14             Who was the other attorney?  Was it -- do you

15   know if it was Michael Gottlieb that came with her or --

16        A.   Describe him.

17        Q.   I have not seen him in person; I've just seen

18   a photo.  Dark hair, very short.

19        A.   Looks young?

20        Q.   Yes.

21        A.   I don't remember him being short.  Brown hair

22   maybe.

23        Q.   I don't know if he's tall or short.  I've

24   never seen him.  I don't know his height.

25        A.   Oh.
```

Video Deposition of Deborah Sines

1    Q.   His hair was short.

2    A.   Oh, that -- that sounds like him.

3    Q.   Okay.

4    A.   I don't remember.  Don't tell him I forgot

5  his name.

6    Q.   Did you discuss any matters beyond what's in

7  the affidavit?

8    A.   I'm certain I told her how bad I felt for her

9  client, and I probably told her how bad I felt for Seth

10  Rich's parents.

11    Q.   Did you discuss any other details about the

12  case?

13    A.   No.  I don't think so.

14    Q.   So you're not certain?

15    A.   I -- I don't think so.

16    Q.   Did you ever exchange any drafts of your

17  affidavit before it was finalized?

18    A.   Only with the Department of Justice.

19    Q.   Okay.  I want to move -- we were talking

20  earlier about some transcripts that are Exhibits 1 and

21  2.

22    A.   Are we done with the affidavit?

23    Q.   Yes.

24    A.   So we're back with Exhibits 1 and 2?

25    Q.   Correct.

Video Deposition of Deborah Sines

1      A.   Okay.

2      Q.   In the third paragraph, quoting Mr. Isikoff,

3  it says:  Sines decided to use her security clearance to

4  ask U.S. --

5      A.   Are you on Exhibit 1 or Exhibit 2?

6      Q.   Exhibit 1.  Do you have that?

7      A.   I don't see where it says that.

8      Q.   Yeah.  Exhibit 1 is Episode 2.  "The Russian

9  Connection" at the top.

10     A.   Yes.

11     Q.   You go down to the third paragraph.  Mr. --

12  Mr. Isikoff, last sentence of that paragraph.

13     A.   Yes, I see it now.

14     Q.   Okay.  It says:  Sines decided to use her

15  security clearance to ask the U.S. intelligence

16  community to help her figure the puzzle out.

17          Is that correct?

18     A.   That's what it says.

19     Q.   Is that what you had told him?

20     A.   Yes.

21     Q.   Was that true?

22     A.   I have been instructed by the Department of

23  Justice that they have not authorized me to make any

24  statements in violation of the law enforcement privilege

25  and case investigatory steps I took while I was an

Video Deposition of Deborah Sines

1   assistant U.S. attorney.

2      Q.   So you're telling us, Ms. Sines, that you

3   were able -- or willing to talk with a reporter about

4   this, but you won't talk about it today; is that

5   correct?

6      A.   I'm telling you I was wrong to talk to a

7   reporter about that, and I did not have the authority --

8   permission from the Department of Justice to do that.

9   And I'm telling you the Department of Justice has

10   instructed me not to talk about that, and, in fact,

11   that's in the letter they sent you.

12      Q.   Have you been threatened with prosecution if

13   you talk about these things?

14      A.   No.   I haven't been threatened at all by the

15   Department of Justice.

16      Q.   Have they indicated there might be any

17   repercussions at all if you talk about these things?

18      A.   No.   Why do you think they're not here, sir?

19      Q.   I have no idea, Ms. Sines.

20      A.   Well, let me --

21      Q.   I'm asking questions.

22      A.   Let me posit it to you that they have

23   explained all of the reasons and the law about what I am

24   allowed to talk about and what I'm not allowed to talk

25   about.   I should have gotten permission from them.   I

Video Deposition of Deborah Sines

```
 1   didn't, and now I see why I shouldn't have said that.
 2   They're right.  I was wrong.  I am allowed --
 3        Q.   Let me ask you this question.
 4        A.   -- to tell you if I said it.  I'm not allowed
 5   to talk about those things at all.  And as you know --
 6        Q.   So you're -- go ahead.
 7        A.   As you know, in their letter to you, I'm not
 8   allowed to testify about things I did while I was on the
 9   job.
10        Q.   Well, I want to ask you specifically about
11   your communications with Mr. Isikoff during the
12   interviews.  Did you -- did you say anything to him that
13   you now know to be false?
14        A.   I don't think so.
15        Q.   So to the best of your knowledge the things
16   that you said to Mr. Isikoff were true; is that correct?
17        A.   Yes.
18        Q.   Can you say which U.S. intelligence agencies
19   you spoke with?
20        A.   No.  And you know why.
21        Q.   Ms. Sines, there's no need to make this
22   unduly adversarial.  I'm --
23        A.   I'm not trying to.
24        Q.   -- trying to ask questions.
25        A.   I just told you the parameters of what I'm
```

Video Deposition of Deborah Sines

1   allowed to say, and, no, I'm not allowed to tell you who

2   I talked to either in the Intelligence community or the

3   law enforcement community or both.

4        Q.   Okay.  The next -- or a couple paragraphs

5   down, there's a -- there is a statement by Mr. Isikoff

6   about -- starts with a discussion about the website

7   whatdoesitmean.com.  And later in that paragraph it

8   says:  What Sines discovered was a fake bulletin

9   circulated by the Russian SVR, the Kremlin's version of

10  the CIA, that was intercepted by U.S. intelligence

11  agencies.

12            Did you tell -- did you say that to Mr.

13  Isikoff?

14       A.   Yes.

15       Q.   And to the best of your knowledge, was that a

16  truthful statement to Mr. Isikoff?

17       A.   Yes.

18       Q.   Do you -- do you know -- well, can you say

19  who intercepted this bulletin?

20       A.   No.

21       Q.   Can you say who told you that it was fake?

22       A.   No.

23       Q.   If you go farther down the page, at the

24  bottom Isikoff says:  In short, Sines had uncovered the

25  original document that started all of the Seth Rich

Video Deposition of Deborah Sines

1    conspiracy theories.

2          Did you tell Mr. Isikoff that?

3      A.    No.   I think that's him surmising that one

4    original document started all the conspiracy theories, I

5    think.   That's his call on that.   That's not what I

6    said.

7      Q.    Okay.   On the next page, on the third

8    paragraph down, it says -- it's quoting you:

9    Absolutely.   No question in my mind.   They planted this

10   whole conspiracy thing.

11         That's talking about the Russians.   Is that

12   an accurate statement on your part?

13     A.    Yes, sir.

14     Q.    Did you have any personal knowledge, or were

15   you relying on what other people told you to say that?

16     A.    I was relying on my investigation, but I --

17   I'm not permitted to say more than that.

18     Q.    So does the paragraph -- the next paragraph,

19   you're quoted saying:   It was the same nonsense.   The

20   same stuff.   Once it became clear to me that this is

21   coming from the SVR, then -- I mean, that triggers a lot

22   of very serious, Oh, my God, what do I do with this?

23         Can you say what you were relying on to say

24   it came from the SVR?

25     A.    My investigation.

Video Deposition of Deborah Sines

1    Q.   Are you an intelligence analyst?

2    A.   No, I am not.

3    Q.   Have you ever worked in the intelligence

4 field?

5    A.   No.

6    Q.   Do you speak Russian?

7    A.   No.

8    Q.   So then is it safe to say that you were

9 relying on what other people told you?

10   A.   No.

11   Q.   What else were you relying on then?

12   A.   Things I found on the Internet.  Things I

13 found elsewhere.

14   Q.   Like, what kind of -- like, what kind of

15 things?

16   A.   Well, we're talking about what I was doing

17 during my investigation, and the Department of Justice

18 has not given me permission to answer that any further.

19 I'm sorry.

20   Q.   Well, if we're talking about things on the

21 Internet, those are public documents; correct?

22   A.   Not if it shows a law enforcement technique

23 as it does here in my investigation.

24   Q.   And so did you personally go out and find

25 these things on the Internet?

1      A.    Yes.

2      Q.    And even though you're not an analyst and you

3   don't speak Russian, it's your testimony that you have

4   sufficient expertise to know that this came from the

5   SVR?

6      A.    To know some of this came from the SVR, but,

7   again, as you point out, I'm not an expert.

8      Q.    Well -- but you're saying with some certainty

9   that it came from the SVR, and you're saying that you

10  relied on things that you personally found on the

11  Internet; is that correct?

12     A.    Yes.  And elsewhere.

13     Q.    Okay.  But does -- in terms of the things you

14  found on the Internet, you think that's sufficient to

15  say, based on your background and knowledge, that this

16  came from the SVR?

17     A.    Some of this came from the SVR, yes.  I

18  believe that completely.

19     Q.    I understand that you believe that, but

20  that's not my question.  My question was, based on this

21  Internet research that you did, do you believe you have

22  sufficient background and knowledge to say that this was

23  proof that it came from the SVR?

24     A.    Counselor, although I'm not expert, I'm a

25  high school graduate.  I think I'm bright enough to

1   comprehend what I read.  If -- if it's in Russian, I can

2   certainly have it translated.  If it's -- if I don't

3   understand it, I certainly have -- used to have enough

4   people to help me and explain it to me, but as you point

5   out, I'm no expert.  Could I be wrong?  It's possible.

6   Was I wrong in this case?  I don't think so.

7        Q.   Do you know what a false flag operation is?

8        A.   No, I do not.

9        Q.   Well, are you familiar with or do you

10  comprehend the idea of one group or one nation trying to

11  make -- make it look as if another group or another

12  nation was responsible for something?

13       A.   Sure.  It's been all over the news for the

14  last couple of years.

15       Q.   Okay.  Well, if we could accept that for the

16  time being as the definition of a false flag operation,

17  is it possible that what you were relying on, in terms

18  of your Internet research or any other information,

19  could be comprised as a false flag operation?

20       A.   Of course, if I limited myself and believed

21  everything I read.  I found so many false things there

22  that it was pretty easy to -- it was very easy to

23  understand how much of it was false.

24       Q.   I'm not sure I follow.  What are we talking

25  about that's false?

1      A.    If Country A blames Country B for a virus --

2      Q.    Uh-huh.

3      A.    -- and the virus actually started in Country

4  A, eventually any idiot can figure out where the virus

5  started.  I mean, that --

6      Q.    Okay.

7      A.    -- that's easy to understand.  If someone

8  wants to blame Seth Rich's murder --

9           MR. CLEVENGER:  You guys, I'm sorry.

10      There's a little bit of background noise.  I

11       can't hear you too well.

12  BY MR. CLEVENGER:

13      Q.    Go ahead.  I'm sorry.

14      A.    It's okay.  It sounds like that was coming

15  from your -- your side.

16      Q.    No.  It's quiet where I am.

17      A.    Okay.  If someone wants to -- if someone

18  accuses Seth Rich of being murdered by a professional

19  hit team, it's pretty easy to figure out whether that's

20  accurate or not.  It -- it's -- it's not rocket science.

21  Now, if someone wants to set up the Russians to take the

22  fall when it's not the Russians at all, I'm certain that

23  can happen too.  In fact, Russia often claims that --

24  oh, let's say somebody's killed with uranium or some

25  other kind of poison, Russia often claims they had

1    nothing to do with it, and it's a -- they're just being

2    used as a scapegoat, and they're being set up.

3         Q.   Would you agree with me, Ms. Sines, that

4    your -- you don't really have the background or the

5    expertise to -- to determine whether something is a

6    false flag operation or whether it came from a foreign

7    source or didn't come from a foreign source?

8         A.   If you don't research it, you won't know what

9    you're doing.  I agree with that.

10        Q.   Well, that's not really my question.  My

11   question was:  Do you have the background and the

12   knowledge, personally, to determine whether something is

13   a false flag operation and whether it did or didn't come

14   from a foreign source?

15        A.   No, I don't.

16        Q.   Back to the Exhibit 1.  There's a line

17   through the middle of the second page, and beneath that

18   it quotes Mr. Isikoff:  After Deborah Sines got her

19   hands on these -- on those SVR bulletins and, over time,

20   saw how Russian propaganda was exploiting her case, she

21   wrote a memo that she sent to the National Security

22   Division of the Justice Department.

23             Did you say that to Mr. Isikoff?

24        A.   I told him that I sent a memo to the National

25   Security Division of the Justice Department.

Video Deposition of Deborah Sines

1    Q.    And was that a truthful statement to him?

2    A.    Yes.

3    Q.    And -- and was he allowed to see that memo?

4    A.    No.

5    Q.    And the next sentence says:   And she later

6    briefed the prosecutor's agents worked -- working for

7    Special Counsel Robert Mueller.

8          Is that correct?

9    A.    I said that.

10   Q.    And was that a truthful statement to Mr.

11   Isikoff?

12   A.    Yes.

13   Q.    Do you know approximately when that meeting

14   would have occurred?

15   A.    Either the same month I retired or the month

16   before.  I retired April 30th, 2018.

17   Q.    Okay.  How about the memo?  Approximately

18   when was that sent?

19   A.    Maybe 2017.  Maybe.

20   Q.    Okay.

21   A.    Yeah.  I think 2000- -- I think 2017.

22   Q.    Do you know or can you say who you spoke with

23   from Mr. Mueller's office?

24   A.    I don't remember his name, but I'm not

25   allowed to tell you anyway.

 1        Q.   Can you say whether he was a prosecutor

 2   versus an FBI agent?

 3        A.   There was an FBI agent and a prosecutor

 4   present.

 5        Q.   Okay.  Let's go ahead and turn to Exhibit 2.

 6        A.   Do I get a copy of these exhibits?

 7        Q.   I can certainly send you -- send them to you.

 8        A.   I'd rather do this through the court

 9   reporter.

10        Q.   That's fine.

11             THE WITNESS:  Is that okay with you?

12             THE COURT REPORTER:  Of course.

13             THE WITNESS:  Okay.  Exhibit 2, sir.

14   BY MR. CLEVENGER:

15        Q.   Yes.  On the first page -- looks like the

16   one, two, three, four -- fifth paragraph, Mr. Isikoff

17   says:  You may recall from earlier episodes that Sines

18   discovered that Russian intelligence agents had planted

19   a wild conspiracy story about Seth Rich's murder just

20   three days after his death.  Now she was seeing the

21   conspiracy claims being amplified by some of the loudest

22   voices in conservative media.

23             Did -- did you make that statement to Mr.

24   Isikoff?

25        A.   I don't think I called it the "conservative

Video Deposition of Deborah Sines

1  media."  I think I told him that I saw -- what your

2  client said on CNN, which I don't know if CNN is

3  conservative or not.  I saw Rod Wheeler making

4  allegations.  I saw Matt Couch making allegations.  So I

5  don't know if I said the "loudest voices in the

6  conservative media."  I think those might be his words.

7      Q.   Okay.  Going down the page a couple more

8  paragraphs, Mr. Isikoff says:  The specifics in the

9  story -- the story was that there was an FBI report

10 about an FBI analysis of Seth Rich's computer, but he --

11 showed he was in communication with WikiLeaks.  Was

12 there any truth to that?

13          And then you said, No.  None.  Complete

14 fabrication.

15          Is that correct?

16      A.   That's what I said.

17      Q.   And do you stand by that statement as being

18 truthful?

19      A.   I do.

20      Q.   So who told you that there had been no

21 investigation, or how do you know?

22      A.   I'm -- I'm -- who told me that there had been

23 no investigation?

24      Q.   That the FBI had not looked into this?

25      A.   I -- I don't think I said they had not looked

 1  into this.

 2      Q.   Okay.  So you were just disavowing the part

 3  where the -- where the analyst said he was showed to --

 4  he was in communication with WikiLeaks?  Is that what

 5  you're disavowing?

 6      A.   Yes.

 7      Q.   Okay.  But you don't know whether -- you're

 8  not saying that the FBI did not conduct an analysis of

 9  his computer; is that correct?

10      A.   That's correct.

11      Q.   So based on what you have here, is it -- is

12  it -- so you are, in fact, saying that there was at

13  least some investigation of his computer by the FBI;

14  correct?

15      A.   Not in -- how do I put this?  I -- this is

16  one of the things I've been instructed I'm not allowed

17  to answer.  And I'm trying to find a way -- let me check

18  my affidavit.  If it's in the affidavit, maybe the

19  Department would -- hold on.

20      Q.   I think there is some reference to the FBI in

21  the affidavit.

22      A.   Wow.  It looks like -- well, I think

23  paragraphs 12 and 13 answer that.  It's just that I did

24  not have permission to tell Michael Isikoff or anyone

25  else who examined Seth Rich's computers.

1    Q.   Okay.  But based on your affidavit, you can

2  now say that the FBI examined his computers; is that

3  correct?

4    A.   Just a minute.  No.  I'm allowed to say I'm

5  aware of no evidence of any contact between Seth or

6  Aaron Rich and WikiLeaks.  And I'm aware of no evidence

7  that Seth Rich ever improperly downloaded information

8  from the DNC or that he provided such information or any

9  other information to WikiLeaks.  And that I'm aware of

10  no evidence that Aaron Rich was involved in the

11  transmission of stolen information from the DNC to

12  WikiLeaks.  And I'm aware of no evidence that Aaron Rich

13  ever received any compensation from WikiLeaks.  And I'm

14  also allowed to say I consulted with several different

15  law enforcement agencies as well as the FBI, but I'm not

16  allowed to say that the FBI or anybody else looked at

17  Seth's computers.

18    Q.   Were any of your communications with the FBI

19  an e-mail or other written form?

20    A.   I'm sure it was.

21    Q.   Okay.  And so is it -- so then basically

22  there would have been some kind of e-mail communications

23  about the Seth Rich -- Seth Rich case with the FBI; is

24  that what you're saying?  I'm not asking you for the

25  contents, just that there would be --

 1        A.    Yes.

 2        Q.    -- e-mail communication?

 3        A.    Yes.  I don't have those.  I don't work there

 4   anymore.

 5        Q.    Right.  But would that be the normal course

 6   of the way things were done?

 7        A.    Yes.

 8        Q.    Okay.

 9        A.    There would be very -- there would be very

10   little between the -- oh, who are they called -- FBI

11   with the Special Counsel's Office.

12        Q.    Okay.  Do you know did -- did -- would there

13   be any written communications with the FBI's CART or

14   commune- -- what is it?  Computer Analysis and Response

15   Team?

16        A.    No, there isn't.

17        Q.    Did you have any kind of written

18   correspondence with -- with FBI personnel other than

19   those assigned to Robert Mueller?

20        A.    Yes.

21        Q.    So -- and I'm just trying to nail this down

22   and make sure I understand you correctly.  The only FBI

23   personnel you communicated with regarding Seth Rich

24   would be those assigned to a Mueller investigation; is

25   that correct?

Video Deposition of Deborah Sines

1  A.  No.

2  Q.  Okay.  Tell -- tell me how I got it wrong?

3  A.  I've spoken with another FBI agent about Seth

4  Rich.

5  Q.  Would that be someone in the Washington Field

6  Office?

7  A.  No.  And I'm not allowed to speak to you

8  about this.  This is part of the investigation.  And as

9  you know, that's still an open case.

10  Q.  Okay.  Well, would there be any written

11  communication e-mails, for example, with that agent?

12  A.  Yes.

13  Q.  So is it fair to say that the FBI had at

14  least some participation in this case?

15  A.  I'm not -- I'm not permitted to answer

16  that -- answer that.  Obviously, I said they did when I

17  spoke with Mr. Isikoff, and I said it in my affidavit.

18  Q.  Okay.  Towards the bottom of the first page

19  of Exhibit 2 --

20  A.  Yes.

21  Q.  -- it quotes you as saying:  There's no -- no

22  connection between Seth and WikiLeaks.  And there was no

23  evidence on his work computer of him downloading and

24  disseminating things from the DNC.

25        And it -- can you say whether or not his work

1    computer was examined by the FBI?

2         A.    I'm not supposed to answer that.

3         Q.    Can you say, though, that his work computer

4    was examined by law enforcement?

5         A.    I'm not supposed to answer that.

6         Q.    As far as you know, the statement that you

7    made here in -- is that true and accurate?

8         A.    Yes.

9         Q.    Do you know whether other computers -- for

10   example, personal computers of his were examined?

11        A.    Yes.

12        Q.    And let's go to the next paragraph on the

13   first page.  Isikoff is quoted -- it's in the bottom

14   paragraph -- as it turned out, there was one sliver of

15   truth in the Fox story.  The FBI had been examining

16   Seth's computer.

17             Did you tell Mr. Isikoff that?

18        A.    I -- I -- I -- I guess I did.  How else would

19   he know it?

20        Q.    Okay.  And as far as you know to this day,

21   were your statements to Mr. Isikoff in that regard

22   truthful?

23        A.    Yes.

24        Q.    Do you know what part of the FBI -- for

25   example, we mentioned CART earlier -- do you know what

1    part of the FBI would have examined his computer?

2        A.   Yes.

3        Q.   And can you say whether that was the CART

4    division --

5        A.   I already told you no.

6        Q.   -- the CART team?

7        A.   No.  I will tell you this, Counsel, there was

8    a separate investigation not involving Seth Rich or

9    Aaron Rich, and I don't know if that investigation is

10   still pending.  I don't know.  I -- I know there was a

11   suspect subject.  I have no idea what happened to that

12   investigation.  I can tell you that.

13       Q.   Okay.  I want to read then -- on the next

14   page, it quotes you as saying:  There were allegations

15   that someone, maybe more than one person, was trying to

16   invade Seth's Gmail account and set up a separate

17   account after Seth was murdered.  And the FBI was

18   looking into that.  I presumed they were trying to

19   create a fake Gmail account and get into Seth's Gmail

20   account so they can dump false information there.

21            Would that be the investigation that you're

22   referring to?

23       A.   That would be something I did not have the

24   authority to say from the Department of Justice.

25       Q.   Okay.

Video Deposition of Deborah Sines

1    A.   But I said it --

2    Q.   But --

3    A.   -- and it was the truth.

4    Q.   Okay.  And the part about creating a fake

5  Gmail account or dumping information in his account,

6  that was just a presumption on your part?

7    A.   No.  No.  Wasn't at all.

8    Q.   Well, if I may read the last sentence again:

9  Because I presumed that they were trying to create a

10 fake Gmail account or get into Seth's Gmail account.

11   A.   They were.  I shouldn't have said "I

12 presume."

13   Q.   Okay.  So somebody was trying to get into

14 these accounts after his death?

15   A.   Yes.

16   Q.   Do you know whether -- or did -- Aaron Rich

17 might still have been accessing that account?

18   A.   I don't -- I don't know what Aaron was doing

19 then.

20   Q.   If we were to provide evidence that Aaron, in

21 fact, was logging into his brother's accounts and

22 altering data after Seth's death, would that be relevant

23 to your murder investigation?

24   A.   Not to my murder investigation.

25   Q.   You don't think if -- if Aaron Rich, the

1  brother, is postmortem tampering with Seth's electronic

2  devices, you don't think that's relevant?

3      A.   I think it's relevant, but not to my murder

4  investigation.  For example, if someone is trying to

5  hack into his dead brother's account and he figures that

6  out and reports it, that -- that doesn't harm my murder

7  investigation at all.

8      Q.   What if he's the one doing the hacking and

9  the tampering?

10      A.   Oh, I'm sure -- I'm sure the experts would be

11  able to figure that out.

12      Q.   But my -- my question is if he's the one

13  doing the hacking and the tampering, would that then be

14  relevant to the murder investigation?

15      A.   No.

16      Q.   So, generally speaking, on a murder

17  investigation -- and since you've done a lot of those,

18  if somebody is tampering with evidence after the fact,

19  that's generally considered to be relevant to the murder

20  investigation, is it not?

21      A.   If -- if somebody is tampering with cartridge

22  casings, somebody is tampering with video evidence,

23  somebody is altering the body, the murder scene, moving

24  the body, falsely blaming the murder on somebody else,

25  very important.  If somebody's hacking somebody's

Video Deposition of Deborah Sines

```
 1   account to take all their money after they're dead, very

 2   important.

 3        Q.   Okay.  So if some -- so if somebody is

 4   hacking that account to alter data or metadata, that

 5   would be relevant too, would it not?

 6        A.   Sometimes.  Sometimes when you lose a loved

 7   one, it could be you don't want anybody else to see the

 8   porn on their computer.  You don't want anybody else to

 9   see embarrassing things about your loved one.  There's a

10   lot of reasons people can do that.

11        Q.   Correct.  But if -- nonetheless, it's

12   relevant to the murder investigation, is it not?  You

13   want to find out why they were doing that?

14        A.   Mr. Clevenger, it wasn't relevant --

15        Q.   Yes.

16        A.   -- to my murder investigation.

17        Q.   Well, that's -- that's what I'm trying to --

18   to hone in on here.  It seems like your kind of, a

19   priori, excluding evidence that doesn't fit your theory.

20        A.   Well, I don't think you've ever invested a

21   homicide in your life.  I'm just guessing; am I right?

22        Q.   Not entirely, I'm an ex-cop.

23        A.   Right.  I don't think --

24        Q.   Going -- okay.

25        A.   -- you've ever prosecuted a homicide
```

Video Deposition of Deborah Sines

1   investigation.  I don't think you've ever done --

2        Q.   I have not prosecuted anyone --

3        A.   -- prosecution to a grand jury.

4        Q.   -- and I don't think some of that's relevant.

5   We're here for a deposition, Ms. Sines, and I'm here to

6   ask you questions.  Okay?

7        A.   And I'm here to try to get you --

8        Q.   Let's try --

9        A.   -- under- -- to understand Aaron Rich was

10  nothing but cooperative.  For you to posit that you have

11  some evidence that he has manipulated evidence, I would

12  ask you -- I would beg you to make that report to the

13  current assistant U.S. attorney who's investigating

14  Seth's murder.

15       Q.   And, again --

16       A.   I've seen --

17       Q.   -- I can tell you that --

18       A.   I've seen none of that.

19       Q.   -- that will be happening in the near future.

20       A.   Okay.

21       Q.   There was a public -- there was a publically

22  filed court document this week from one of Mr. --

23  other -- Mr. Butowsky's other attorneys testified in a

24  declaration that certain e-mail addresses and other

25  electronic information were not provided or withheld.

Video Deposition of Deborah Sines

```
 1   And we don't -- and -- and this -- I'm just giving you
 2   this background information.  We don't think you were
 3   provided with this information either, but anyway --
 4        A.   So e-mail --
 5        Q.   -- let me get back to --
 6        A.   -- addresses were withheld from whom?
 7        Q.   From -- from the discovery in the civil case.
 8        A.   Oh, I don't know anything about that.
 9        Q.   Okay.  Okay.  I want to ask you to look at an
10   exhibit I had -- I had initially marked as Exhibit 3,
11   but we can mark it -- I guess we can still mark it as
12   Exhibit 3.  It's a press release from the U.S.
13   Department of Justice Office of the Inspector General.
14             THE COURT REPORTER:  Would that be it?
15             THE WITNESS:  I don't know.  Let me see.
16        Yeah, that's it.  Thank you.
17             (Plaintiff's Exhibit No. 3 was marked for
18        identification.)
19             THE WITNESS:  I've read it.
20   BY MR. CLEVENGER:
21        Q.   Have you seen that document before?
22        A.   Never.
23        Q.   Do you know whether it -- it's referring to
24   you?
25        A.   I don't believe it is.  I think I would
```

 1    know --

 2         Q.    Were you ever --

 3         A.    -- if I was a target or a subject.  That's

 4    not me.

 5         Q.    Were you ever investigated -- I'm sorry.

 6         A.    I -- I --

 7         Q.    Were you ever investigated --

 8         A.    -- I've never disclosed grand jury materials.

 9         Q.    Okay.  So the information that you disclosed

10    to Isikoff, none -- none of that came from a grand jury?

11         A.    No.  That was law enforcement-privileged

12    investigatory techniques.

13         Q.    Okay.  But -- but -- but none of the

14    information ultimately came from a grand jury?  Is that

15    what you're saying?

16         A.    Of course.

17         Q.    The information that you --

18         A.    Of course.

19         Q.    -- proposed to Mr. Isikoff?  Okay.

20              So it only came from non-grand jury

21    sources --

22         A.    Yes.

23         Q.    -- is that correct?

24         A.    Yes.

25         Q.    Okay.  Did anyone ask or encourage you to

1    speak to Michael Isikoff?

2         A.   Yes.

3         Q.   And who was that?

4         A.   Glenn Kirschner.

5         Q.   And who is Glenn Kirschner?

6         A.   He used to be the chief of homicide at the

7    U.S. Attorney's Office in D.C.  He's retired now.  He's

8    a big shot on MSNBC now.

9         Q.   And so was he retired himself at the time he

10   encouraged you to talk with Isikoff?

11        A.   Yes.

12        Q.   Was he still actively working for the U.S.

13   Attorney's Office during the Seth Rich investigation?

14        A.   Yes.

15        Q.   Okay.  So describe to me how this works?  How

16   do you -- how do you spell his name?  Glenn -- and then

17   how do you spell the last name?

18        A.   G-l-e-n-n K-i-r-s-c-h-n-e-r.

19        Q.   And you said he's a commentator on the MSNBC?

20        A.   Yes.

21        Q.   So how did that go down?  Did he just call

22   you out of the blue?

23        A.   Yes.  No.  We -- we talk often.  We're

24   friends.  We've tried many murders together.  Done many

25   investigations together.

Video Deposition of Deborah Sines

1    Q.    Okay.  And had Isikoff contacted him?

2    A.    Yeah.  Yes.  That's how -- that's how he got

3  to me.

4    Q.    Okay.  So, basically, Mr. Kirschner kind of

5  brokered this meeting between you and Mr. Isikoff?

6    A.    Yes.  Not meeting.  I've never met Mr.

7  Isikoff.

8    Q.    I guess the phone interview?

9    A.    Right.

10    Q.    He brokered that?

11    A.    Right.

12    Q.    Okay.  But he was retired from DOJ at the

13  time he did it; correct?

14    A.    Yes.

15    Q.    Other than the reporter for Rolling Stone,

16  have you spoken with any other journalist?

17    A.    Yes.  But not about this case.

18    Q.    Okay.  Have you spoken about other

19  journalists about anything pertaining to Seth Rich?

20    A.    No.

21    Q.    And the interview that you granted to the

22  Rolling Stone, approximately when was that?

23    A.    2019.  But -- maybe September, maybe.

24    Q.    Do you recall whether you said anything to

25  the Rolling Stone that you had not mentioned to Mr.

1    Isikoff?

2        A.   I think -- I think we talked very briefly.

3        Q.   I'm sorry.  You kind of broke up.  Go ahead.

4        A.   No.  I stopped speaking to think.  I think

5    with Mr. Kroll -- I definitely told him -- we definitely

6    talked about false Internet conspiracy theories, and we

7    definitely talked about the Russians, but nothing in

8    detail.

9        Q.   Okay.  Did you talk about anything pertaining

10   to the murder investigation?

11       A.   I'd say mostly we talked about Seth, what he

12   was like, because I never knew him, and Seth's parents

13   and Seth's brother.  That's -- that's what I recall

14   speaking with Mr. Kroll about.  I have also spoken to

15   him about other things not related to Seth Rich, Aaron

16   Rich, Mary Ann Rich, none of the Riches.

17       Q.   Okay.  I'm going to back up and ask a

18   question about Mr. Kirschner.  Was he the person who

19   assigned you to the Seth Rich case?

20       A.   No.  He wasn't chief anymore.  He had stepped

21   down, and he was a line attorney, but we kind of -- we

22   consulted on all our cases, so...  But, no, he did not.

23   He's not the one who assigned me.  It was my then chief.

24       Q.   And who was -- who was the name of your chief

25   at the time?

1     A.   Michelle Jackson.

2     Q.   Okay.  Was there anybody above her that

3 requested that it specifically be assigned to you?

4     A.   I -- I wouldn't know that.

5     Q.   Okay.

6     MR. CLEVENGER:  I'm going to ask the court

7     reporter to hand you some e-mails we originally

8     submitted as Plaintiff's 2.  I think now that

9     would be 4.  FBI e-mails.

10     (Off-the-record discussion.)

11     (Plaintiff's Exhibit No. 4 was marked for

12     identification.)

13 BY MR. CLEVENGER:

14     Q.   I think there should be two pages; is that

15 correct?

16     A.   Yes.  You know what?  Reading this just

17 reminded me of something.

18     Q.   Okay.

19     A.   I did speak with -- I did speak with an FBI

20 agent -- a supervisory FBI agent assigned to the

21 Washington Field Office.  Not anyone mentioned on -- in

22 these e-mails you've just -- Plaintiff's Exhibit 4.

23     Q.   Did you exchange any e-mails with that

24 supervisory agent?

25     A.   No.  I spoke with him in person.

Video Deposition of Deborah Sines

1      Q.   Okay.  Have you ever seen any of the e-mails

2  in this particular exhibit?

3      A.   Nope.

4      Q.   Do you know any of the people who are named

5  on there like Peter Strzok?

6      A.   I know who he is.  And I know who Lisa Page

7  is, but I don't know who Jonathan Moffa is.  I think

8  those are the only names on here.

9      Q.   Have you ever communicated with either Peter

10 Strzok or Lisa Page?

11     A.   No, I haven't.  As far as I know, I've never

12 met them.

13     Q.   So you've never seen any of this e-mail

14 correspondence before?

15     A.   No, I have not.

16          MR. CLEVENGER:  Let's go ahead -- just a

17      housekeeping matter.  Let's go ahead and -- I'm

18      going to move to exhibit -- to admit that exhibit

19      and any of the previous exhibits that have not

20      been admitted.

21          THE WITNESS:  1, 2, 3, and 4?

22          MR. CLEVENGER:  Correct.  Any objection?

23          THE WITNESS:  Not from me.

24          MR. HARPER:  I -- I mean, I guess I'll just

25      reserve, you know, those kind of evidentiary

1           objections until trial or whatnot, but I

2           certainty consider them marked for the

3           deposition.

4                MR. CLEVENGER:   Okay.   Thank you.

5      BY MR. CLEVENGER:

6           Q.   Have you ever spoken with -- well, let me

7      ask, do you know who John Durham is?   The U.S. attorney

8      in Connecticut?

9           A.   No.

10          Q.   So you were not aware that he was leading a

11     review into the Russian collusion investigation?

12          A.   No.

13          Q.   Has anyone from either the Department of

14     Justice or the FBI reached out to you since you left DOJ

15     to ask questions about Seth Rich?

16          A.   No.

17          Q.   Did you have any role in assisting or

18     preparing the Mueller Report?

19          A.   No.   I read it.

20          Q.   Okay.   Do you know whether the -- if

21     Metropolitan Police Department or the FBI or any other

22     agency specifically investigated whether Seth Rich was

23     involved in the Democratic National Committee e-mail

24     leaks in 2016?

25          A.   I -- I'm not permitted to answer that.

Video Deposition of Deborah Sines

1    Q.   So when you resigned from -- or retired from

2 the U.S. Attorney's Office, were you asked to resign or

3 retire or you just had already planned to retire?

4    A.   Counsel, I was tired.  35 years.  35.  And at

5 the department -- I mean, that's too many murder trials.

6 I was done.  It was time to go.

7    Q.   Okay.

8    A.   No one asked me to leave.  I was not fired.

9 They did ask me to stay.  They even made some very silly

10 offers.  I was -- I was done.

11    Q.   Okay.

12    A.   My last trial was March of 2018, and I will

13 tell you this, verdict came in on a Friday.  Instead of

14 going out and celebrating -- it was a trial -- my last

15 trial I did with Glenn Kirschner -- I went to bed.  I

16 did not get out of my bed until the following Sunday.  I

17 wasn't sick.  I was tired.  And the only reason I got

18 out of bed is because I went to see Black Panther.

19 Seemed like a good reason to get out of bed.  I was just

20 done.

21         MR. CLEVENGER:  I'm going ask the court

22     reporter to hand you what I had originally marked

23     as Exhibit 1.  It's another podcast transcript.

24     I guess now it would be Exhibit 5.

25         (Plaintiff's Exhibit No. 5 was marked for

1            identification.)

2            THE WITNESS:  Okay.

3    BY MR. CLEVENGER:

4        Q.   If you would turn to page 49 of that

5    Episode 6 transcript.  On -- on that page Mr. Isikoff

6    says:  MPD or Metropolitan Police Department examined

7    and reexamined Seth's laptop.

8            Is that something that you told Mr. Isikoff?

9        A.   Yes, it is.

10       Q.   And to your -- to your knowledge, that is a

11   true statement?

12       A.   Yes.

13       Q.   Did the MPD have any assistance from other

14   agencies in examining the laptop?

15       A.   I was not authorized to say what MPD did.  I

16   should not have said that.  That is the law enforcement

17   privilege.  It's an open case.  I'm not allowed to

18   answer anything else other than did I say it and was it

19   true.  I was not authorized to say that.

20       Q.   Do you know whether Aaron Rich disclosed all

21   of his brother's e-mail accounts during the

22   investigation?

23       A.   I'm not allowed to answer that.

24       Q.   On page 54 of the transcript, it quotes you

25   as saying that there was more than one person that was

 1   involved, a gunman and someone who aided and abetted?

 2        A.   Let me just --

 3        Q.   Did you make that statement?

 4        A.   What -- what page is that?

 5        Q.   Okay.  54.

 6        A.   I'm just looking to see where I'm talking.

 7   Wait a minute.  Can you give me a line, Counsel?

 8        Q.   Actually, I don't have it in front of me.

 9   Let me pull it up.  Just a second.

10        A.   I've got it.  I see it.

11        Q.   Okay.  Was that --

12        A.   Hold on.

13        Q.   Is that --

14        A.   Let -- let me read it.

15        Q.   Sure.

16        A.   I said it.  That's the truth.

17        Q.   Okay.  Can you say why you believe it was

18   more than one person?

19        A.   I wish I could.  From my investigation.  From

20   the evidence.

21        Q.   Okay.

22        A.   I really do wish I could answer your

23   question.

24        Q.   I understand.  You said in the interview that

25   you had to track down every lead.  Did you or anyone

Video Deposition of Deborah Sines

```
 1   from your investigative team attempt to contact

 2   WikiLeaks?

 3        A.   Oh, I'm not allowed to answer that.

 4        Q.   And I understand you may not be able to

 5   answer these, but I -- I have to get them on the record.

 6        A.   I understand.  I understand.

 7        Q.   Did you or anyone from your team attempt to

 8   interview or contact Julian Assange?

 9        A.   I'm not permitted to answer that either.

10        Q.   What about Kim Dotcom?

11        A.   I'm not allowed to answer that either.

12        Q.   Did you issue subpoenas to obtain Aaron

13   Rich's bank accounts?

14        A.   I'm not allowed to answer that.

15        Q.   Did you issue subpoenas to obtain Seth Rich's

16   bank accounts?

17        A.   I'm not allowed to answer that.

18        Q.   Did you issue subpoenas to obtain Aaron or

19   Seth Rich's PayPal or eBay accounts?

20        A.   I'm not allowed to answer that.  That's all

21   grand jury.

22        Q.   I understand.

23        A.   I know.

24        Q.   Again, I'm just putting this on the record.

25        A.   I understand.
```

Video Deposition of Deborah Sines

1    Q.   Did you issue -- did you issue a subpoena to

2  the estate of Seth Rich demanding that the estate

3  produce to law enforcement any laptop or electronic

4  devices in Aaron Rich's possession?

5    A.   I'm not allowed to answer that.

6    Q.   Are you familiar with any of the four

7  following e-mail accounts -- or I'll just go one at a

8  time.

9         Are you familiar with the e-mail account

10  sethcrich -- seth.c.rich@gmail.com?

11    A.   I'm not allowed to answer that.

12    Q.   Are you familiar with the e-mail address

13  panda, with the number four, and then

14  progress@gmail.com?

15    A.   I'm not permitted to answer that.

16    Q.   Are you familiar with the e-mail address

17  sethnathanrich@protonmail.com?

18    A.   I'm not permitted to answer that.

19    Q.   Are you familiar with the e-mail address

20  anr12105@aol.com?

21    A.   I'm not permitted to answer that.

22    Q.   Do you know whether Aaron Rich altered

23  metadata on Seth-Rich related information provided to

24  law enforcement?

25    A.   No.

1    Q.   You don't know?  Is that the -- is that

2  your --

3    A.   I -- I have no information that that's the

4  case.

5    Q.   Okay.  Do you know whether Aaron Rich deleted

6  social media and other electronic data relating to Seth

7  Rich or any of Seth Rich's social media accounts or

8  content?

9    A.   No.

10   Q.   Do you know whether Aaron Rich deleted any

11  information from any of the above e-mail accounts?

12   A.   No.

13   Q.   Was Aaron Rich a person of interest?

14   A.   I'm not permitted to answer that.

15   Q.   If you were to learn that Aaron Rich altered

16  metadata on Seth-Rich related records, would that

17  concern you?

18   A.   No.

19   Q.   You don't think that would be relevant to a

20  murder case?

21   A.   You've already asked me this, Counsel.  This

22  is asked and answered.  I interviewed Aaron Rich

23  thoroughly, and if he altered anything, I predict it

24  wouldn't have anything to do with this murder

25  investigation.

Video Deposition of Deborah Sines

1  Q.   So basically you kind of decided that Aaron

2  Rich is not going to be a suspect no matter what?  Is

3  that --

4  A.   No.  That's --

5  Q.   -- your position?

6  A.   -- completely false.  If I had evidence that

7  anyone who even looked like Aaron Rich was involved in

8  Seth's murder, that would be my man.  That's not my

9  evidence.  And of course I can't tell you what the

10 evidence is.

11 Q.   I understand that.  But you're saying that if

12 you were presented with evidence that Aaron Rich altered

13 the metadata on Seth Rich's records, that would not

14 impact your feelings on the murder -- about the murder

15 case?

16 A.   Correct.  It might raise flags about

17 something else, but not the murder.

18 Q.   Do you know when Seth Rich's laptop was first

19 analyzed by the D.C. police?

20 A.   I'm not authorized to answer that.  I do

21 know, but I'm not allowed to answer it.

22 Q.   Do you know when the laptop was analyzed by

23 the FBI?

24 A.   I'm not allowed to answer that.

25 Q.   But you do know the answer?

Video Deposition of Deborah Sines

1       A.    I'm probably not supposed to say that either.

2  Given that there still exists a law enforcement

3  privilege that I'm not authorized to discuss or

4  disclose, I -- I have to say I can't answer that.

5  Especially now that you showed me that bulletin where

6  somebody got investigated and almost prosecuted for

7  doing that without permission.

8       Q.    Do you know how long Seth Rich's laptop

9  remained in Aaron Rich's custody?

10      A.    I'm not permitted to answer that.

11      Q.    Do you know how long Seth Rich's second cell

12  phone remained in the custody of Aaron Rich?

13      A.    I'm not permitted to answer that.

14      Q.    Would it concern you if you were to learn

15  that Seth Rich's second cell phone had been subject to a

16  factory reset?

17      A.    I'm not permitted to answer that.

18      Q.    Well, my question is not whether it did or

19  didn't happen, but as a homicide investigator, would

20  those facts -- if those facts were true, would that

21  concern you?

22      A.    Yes.

23      Q.    Would it concern you if you knew Seth Rich's

24  phone had data on it at the time of his murder that was

25  delivered in its original factory condition to law

1    enforcement?

2        A.   Would it -- you -- I'm sorry -- you have to

3    say that again.  I -- I don't think I understand that

4    one.

5        Q.   Sure.

6        A.   Would it concern me --

7        Q.   So if --

8        A.   -- if what?

9        Q.   Yes.  If -- if -- would it concern you if you

10   knew that Seth Rich's phone -- phones -- second phone

11   had data on it at the time of his murder, but it was

12   later delivered in its original factory condition to law

13   enforcement?  In other words --

14       A.   Oh, I see what you mean.

15       Q.   -- the data on it --

16       A.   Yes.  But usually when that happens, we can

17   bring it back -- they can bring it back up.  Yes, that

18   would concern me.

19       Q.   Okay.  I think I know the answer to the next

20   question.  Let's see.

21            Were you aware of any death threats being

22   made to Democratic National Committee staffers during

23   the period prior to Seth Rich's murder?

24       A.   I'm not permitted to answer that.

25       Q.   Was it common knowledge in the Democratic

Video Deposition of Deborah Sines

```
 1    National Committee, prior to Seth Rich's murder, that

 2    the Russians had hacked into the Democratic National

 3    Committee and that no other possibility was being

 4    investigated by the FBI?

 5         A.   I'm not permitted to answer that.

 6         Q.   Were you responsible for a criminal

 7    investigation of Matt Couch?

 8         A.   No.

 9         Q.   Do you know whether someone else at the DOJ

10    would?

11         A.   I'm not permitted to answer that.  Did you

12    ask:  Did I participate it --

13         Q.   Were you responsible --

14         A.   -- or was I responsible?  I'm not

15    permitted --

16         Q.   Well, actually either?  Did you --

17         A.   I'm not permitted --

18         Q.   -- participate or --

19         A.   -- to answer either.

20         Q.   Okay.  Did you participate in or were you

21    responsible for a criminal investigation of Edward

22    Butowsky?

23         A.   No.

24         Q.   Do you know whether someone else at DOJ was?

25         A.   No.
```

1          Q.    Do you know whether Matt Couch -- not -- I'm

2     not asking you to answer; I'm just -- do you know

3     whether Matt Couch is the subject of a criminal

4     investigation in connection with the murder of Seth

5     Rich?

6          A.    I'm not permitted to answer that.

7          Q.    Do you know whether Ed Butowsky is the

8     subject of a criminal investigation in connection with

9     the murder of Seth Rich?

10         A.    I'm not permitted to answer that.

11         Q.    Did Aaron Rich provide you or your colleagues

12    with evidence in connection with a criminal

13    investigation of Matt Couch or Ed Butowsky?

14         A.    I'm not permitted to answer anything about

15    what Aaron Rich provided me during my investigation.

16         Q.    Do you know who Kelsey Mulka is?

17         A.    Oh, I'm not permitted to answer that.

18         Q.    Can you say whether -- have you -- you've

19    ever spoken with somebody by the name of Kelsey Mulka?

20         A.    I'm not permitted to answer that.

21         Q.    Did a person by the name of Kelsey Mulka ever

22    provide you or your colleagues at DOJ with evidence

23    regarding a criminal investigation of Matt Couch or

24    Edward Butowsky?

25         A.    I'm not permitted to answer that.

1      Q.   Did you ever provide Aaron Rich with any kind

2   of legal advice in connection with the potential

3   defamation or harassment or other kind of lawsuit

4   against Matt Couch or Ed Butowsky?

5      A.   I've never given a witness legal advice --

6   any witness.

7      Q.   Have you given him any kind of advice about

8   filing a potential defamation or other lawsuit --

9      A.   No.

10     Q.   -- against Matt Couch or Ed Butowsky?

11     A.   No.

12     Q.   Do you know whether any of your colleagues

13  provided such advice to Aaron Rich?

14     A.   No.

15     Q.   Did you issue any subpoenas to Rod Wheeler?

16     A.   I'm not permitted to answer that.

17     Q.   Would you consider his investigation of the

18  Seth Rich murder to be credible?

19     A.   I wish I was permitted to answer that.

20     Q.   Are you in contact with Donna Brazile?

21     A.   No.

22     Q.   Have you communicated with her since you

23  retired?

24     A.   No.

25     Q.   Before you retired?

1      A.   No.

2      Q.   Are you in contact with Muriel Bowser?

3      A.   No.

4      Q.   Have you communicated with her since you

5   retired?

6      A.   No.

7      Q.   Before you retired?

8      A.   No.

9      Q.   Other than your e-mails that you've produced

10  with Aaron Rich, Joel Rich, Mary Ann Rich, have you had

11  any communications with the three of them?

12     A.   Yes.

13     Q.   Would these be telephone conversations?

14     A.   Some were telephone and there were other

15  e-mails, but they were deleted well before I got

16  subpoenaed.  Celebrating the birth of a grandchild, me

17  retiring.  I -- I -- I've sent the Riches New Year's

18  cards.  Probably Chanukah cards too.  And we've

19  certainly spoken on the phone.

20     Q.   Do you know approximately how many e-mails

21  were deleted?

22     A.   I have no idea.

23     Q.   Since your retirement, have you had any

24  communications with Kelsey Mulka?

25     A.   No.

Video Deposition of Deborah Sines

1    Q.   What about Pratt Wiley?

2    A.   No.

3    Q.   Are you aware of theories that Seth Rich was

4  killed at the hospital?

5    A.   Yes.

6    Q.   What do you think of those theories?

7    A.   You're going to my investigation.  I'm not

8  permitted to answer that.  I wish I could though.

9    Q.   Are you aware of theories that Seth Rich was

10  in possession of a thumb drive containing valuable

11  information at the time of his death?

12    A.   The theory?  Yes.  Yes.  I'm aware of that

13  theory.

14    Q.   And what do you think of that theory?

15    A.   I'm not allowed to answer that.

16    Q.   Did you investigate whether Seth Rich was

17  having work-related difficulties?

18    A.   I'm not permitted to answer that.

19    Q.   Do you know whether Seth Rich was having

20  work-related difficulties?

21    A.   I'm not permitted to answer that.

22    Q.   Did you ask Aaron Rich what -- what he knew

23  about any work-related difficulties that Seth Rich was

24  having?

25    A.   I'm not permitted to answer that.

1          Q.    Did you ask Kelsey Mulka what she knew about

2    any work-related difficulties Seth Rich was having at

3    the DNC?

4          A.    I'm not permitted to answer that.

5          Q.    Do you think it's valid to investigate

6    work-related difficulties in a homicide investigation of

7    a political staffer?

8          A.    Can you ask that again?

9          Q.    Sure.  Just in general -- general question --

10   do you think it is valid to investigate work-related

11   difficulties in a homicide investigation from a

12   political staffer?

13         A.    Yes, I do.

14         Q.    Okay.  Did you conduct a forensic examination

15   of Seth Rich's work computer?

16         A.    I'm not permitted to answer that.

17         Q.    If your working theory was that Seth Rich was

18   the victim of a botched robbery, did you exclude other

19   possible theories?

20         A.    Of course not.

21         Q.    Did you vote for Hillary Clinton?

22         A.    Yes.

23         Q.    Do you hate Donald Trump?

24         A.    I have no respect for the president.  I don't

25   hate him.

 1          Q.   Do you think he is -- okay.  Do you think

 2     he's incompetent?

 3          A.   Yes.

 4          Q.   Do you think he is dangerous?

 5          A.   Yes.

 6          Q.   Do you think he is a fascist?

 7          A.   A fascist may be too strong of a term.  I

 8     think he's dishonest.

 9          Q.   Do you think --

10          A.   I think he's a racist.  I think he's a

11     blowhard show horse.  And I think the reason he's

12     dangerous is because he surrounds himself with "yes

13     people," and he ignores advice from very experienced

14     people.  But I don't -- I don't think -- I don't think

15     hate is -- is an appropriate term.  And I don't think

16     fascist is an appropriate term.  I think he's a rich

17     guy, and he's very privileged, and that's how he

18     comports himself.  I should also tell you that I did not

19     vote for Hillary Clinton when she ran against Obama.

20          Q.   Okay.  Do you think Donald Trump is a

21     xenophobe?

22          A.   I don't know.  I -- I don't what he is.

23          Q.   Is he sexist?

24               THE COURT REPORTER:  Can you repeat that?

25               MR. CLEVENGER:  I just asked if she thinks

1          Donald Trump is a xenophobe.

2              THE COURT REPORTER:  And what did you ask

3         after that, sir?

4              MR. CLEVENGER:  That -- that was my last

5         question.

6              THE COURT REPORTER:  Okay.

7              THE WITNESS:  I thought you then asked is he

8         a sexist.

9    BY MR. CLEVENGER:

10        Q.   Oh, you're right.  Yes.  That was my next

11   question.

12        A.   Sure.

13        Q.   Is Donald Trump a sexist?

14        A.   Sure.

15        Q.   If you obtained evidence that the Russian

16   hacking theory at the DNC was false, would you feel duty

17   bound to provide that information to the attorney

18   general?

19        A.   No.  I -- I wouldn't go directly to the

20   attorney general.  I would -- I would do it through my

21   chain of command.  You know, I would go to the U.S.

22   attorney who would then go to the attorney general.  The

23   only times I have dealt directly with attorney generals

24   has been for some special investigations I was assigned

25   to where I had to report directly to them, but with

Video Deposition of Deborah Sines

1    respect to this investigation, and even stuff with

2    Russian intelligence, you have to be very careful to

3    make sure -- you know, you don't -- how do I put this?

4    You don't -- you don't just walk up to the attorney

5    general.  Also, you have to -- the people you go

6    through, you have to make sure they have the appropriate

7    security clearances for whatever it is you have to tell

8    them, but, yes, I would make sure that information got

9    sent up the chain.

10        Q.   What is your opinion of the current attorney

11   general?

12        A.   I don't know how that is relevant, but I'll

13   answer it.  I'm very disappointed and embarrassed at the

14   way he's conducted himself.  I know many of the lawyers,

15   including myself, who are very dispirited and

16   embarrassed.  He appears not to be -- he appears to be

17   very partisan.  And for a lifelong career prosecutor --

18   I'll just speak for myself.  I have been threatened; my

19   family has been threatened.  I have been assaulted at

20   the courthouse.  I have devoted my entire career to --

21   first, at the Civil Rights Division trying to vindicate

22   racial violence and dirty police officers, and then --

23   gosh, since 1996, maybe, I've been prosecuting murder

24   cases trying to vindicate the rights of people who were

25   killed.  And to see an attorney general not back his

1  people up and just dismiss them the way I've seen

2  Attorney General Barr do is very disappointing, very

3  dispiriting, and it makes me sad.  A lot of good people

4  have left.  People that really believe in doing that

5  thing we all call justice, and I don't see them ever

6  coming back.  I -- I keep in touch with some of my

7  former colleagues who are still there.  It's a struggle.

8  Not because they're Democrats.  Many are Republicans.

9  It's because they're dispirited, and they're

10  embarrassed.

11      Q.   Are you familiar with the -- the phrase or

12  the term "the resistance"?

13      A.   Oh, yeah.  I've heard it.

14      Q.   And as it relates to the Trump

15  administration?

16      A.   Yes, I've heard it.

17      Q.   Were you part of the resistance?

18      A.   Of course not.  I've worked for -- I think I

19  started working with Reagan.  I have worked for

20  Democrats and Republicans.  When you're doing justice,

21  it doesn't matter who's in charge until now.  No one

22  ever asked me, What's your political party?  No one ever

23  accused me of not doing my job because I didn't like who

24  the boss was.  That's all new.  And it's one of the

25  things that's repugnant, disgusting, and makes me very

Video Deposition of Deborah Sines

1   sad.

2       Q.   Did you tell Aaron Rich that he was free to

3   delete electronic communications belonging to Seth Rich?

4       A.   No, I did not.

5       Q.   Did you tell Aaron Rich he could delete

6   information -- any other kind of information relating to

7   Seth Rich?

8       A.   No, I did not.

9       Q.   If Aaron Rich had material information

10  relating to Seth Rich's communications with WikiLeaks,

11  do you believe he would have had a duty to bring that

12  information to your attention?

13      A.   Yes.

14      Q.   Did you tell Aaron Rich he could alter the

15  metadata on Seth Rich's electronic communications?

16      A.   No.

17      Q.   Did you investigate whether Russians tried to

18  hack into the electronic devices of Aaron Rich after the

19  Fox News article broke on May 15, 2017?

20      A.   I'm not allowed to answer that.

21      Q.   Did you investigate whether the Russians

22  tried to hack into the electronic devices of Brad Bauman

23  after the May 15, 2017 article?

24      A.   I'm not allowed to answer that.

25      Q.   Do you know Brad Bauman?

1      A.   No.

2      Q.   Have you ever communicated with someone by

3  that name?

4      A.   I'm not allowed to answer that.

5      Q.   Did you discover any evidence that Russians

6  had hacked into Aaron's electronic devices or into

7  Seth's electronic devices?

8      A.   I'm not allowed to answer that.

9           MR. CLEVENGER:   I believe that is the end of

10          my questions.

11          Would you guys like to take a lunch break?

12          THE WITNESS:   No.  I'd like to get this over

13          with.  I'm in a fairly small room, and we have a

14          pandemic going on.  I don't want to come back.

15          MR. HARPER:   Yeah.  That's fine with me.

16          Might we take a five-minute bathroom break?

17          Would that be --

18          THE WITNESS:   Sure.

19          MR. HARPER:   -- good for everybody?  I'm --

20          THE WITNESS:   Sure.

21          MR. HARPER:   I want to make sure the court

22          reporter is also -- give her a five-minute

23          break --

24          THE WITNESS:   Is that okay?

25          MR. CLEVENGER:   Good idea.

Video Deposition of Deborah Sines

```
 1              MR. HARPER:  -- and come back and get
 2       started.
 3              THE WITNESS:  All right.
 4              THE VIDEOGRAPHER:  Time is 12:03, and we're
 5       off the record.
 6              (Recess had from 12:03 p.m. to 12:14 p.m.)
 7              THE VIDEOGRAPHER:  Time is 12:14, and we're
 8       back on the record.
 9                    CROSS-EXAMINATION
10  BY MR. HARPER:
11       Q.   Ms. Sines, my name is David Harper.  I'm a
12  lawyer with the law firm of Haynes and Boone based in
13  Dallas, and we represent the defendants in the case,
14  including National Public Radio.  National Public Radio
15  and some of its personnel, including one of its
16  reporters, was sued by Mr. Butowsky, the plaintiff in
17  this case.  Do you understand that?
18       A.   Yes, sir.
19       Q.   And it -- the -- the -- the -- part of the
20  lawsuit relates to a Fox News story in May of 2017 that
21  related to Seth Rich's death.  Are you aware of that?
22       A.   Is that the story with Mr. Wheeler and
23  Mr. Butowsky?
24       Q.   Yes.  The story -- the story includes
25  Mr. Wheeler.
```

1    A.   And not Mr. Butowsky?

2    Q.   I don't believe that the Fox News story talks

3  about Mr. Butowsky.

4    A.   All right.  I'm -- I am familiar -- I've seen

5  several Fox things.  That's why I was asking that

6  question.

7    Q.   Well, first let me say thank you for

8  appearing today in this highly unusual time, and I will

9  try to be very respectful of your time, but I just

10  wanted to say I'm grateful for you appearing today in

11  light of what's going on in the country.

12    A.   Thank you, Mr. Harper.  I -- I did not want

13  to come here because of the pandemic.  It's difficult

14  for me.  I'm elderly.

15    Q.   And you are appearing today in response to a

16  subpoena that was issued to you by Mr. Butowsky's

17  lawyers, and then we served a follow-on subpoena; is

18  that correct?

19    A.   Yes, sir.

20    Q.   And we first spoke today shortly before your

21  deposition on this video conference process that we're

22  using; is that right?

23    A.   Yes.

24    Q.   And you understand that the Department of

25  Justice has been advised of this deposition.  They're

 1    aware of it --

 2         A.   Yes.

 3         Q.   -- is that right?

 4              And as far as you -- and -- and as -- in your

 5    understanding, that -- they've -- they've decided not to

 6    appear today; is that correct?

 7         A.   Yes.

 8         Q.   Now, I'll apologize in advance that some of

 9    my questions may seem a little bit repetitive, but I'll

10    try to minimize that, but I'm going to be going through

11    some of the same documents that you already went

12    through --

13         A.   All right.

14         Q.   -- with Mr. Clevenger.

15              MR. HARPER:  First, could we mark -- let me

16         ask the court reporter if we could mark the

17         affidavit that was included in the documents you

18         produced earlier today as the next exhibit.  I

19         believe Exhibit 6.

20              (Off-the-record discussion.)

21              (Defendants' Exhibit No. 6 was marked for

22         identification.)

23              THE WITNESS:  I have it, Mr. Harper.

24    BY MR. HARPER:

25         Q.   Thank you.  So Exhibit 6 is an affidavit that

1    you prepared; is that right?

2         A.    Yes, sir.

3         Q.    And although this copy is not signed, you did

4    sign an affidavit with this same content in it; is that

5    right?

6         A.    Yes, I did.

7         Q.    And are all the statements in your affidavit,

8    which is Exhibit 6, true and correct?

9         A.    Yes.

10        Q.    Now, I understand that because of your former

11   role as a prosecutor, that the Department of Justice has

12   instructed you not to speak about certain matters; is

13   that correct?

14        A.    Yes.

15        Q.    And that's largely based upon a law

16   enforcement privilege based upon investigating criminal

17   matters; is that correct?

18        A.    Yes.  And grand jury.

19        Q.    Okay.  And -- but the Department of Justice

20   actually approved the statements that you made in this

21   affidavit; is that right?

22        A.    That's true.

23        Q.    Let me -- if I could, I'm going -- I'm going

24   to walk you through the statements in your affidavit; is

25   that all right?

1      A.   Yes.

2           THE COURT REPORTER:  Mr. Harper?

3           MR. CLEVENGER:  Yeah.  I can't hear him

4       either.

5  BY MR. HARPER:

6      Q.   I apologize.  Can you hear me?

7      A.   We can.

8      Q.   The -- my Internet connection must have

9  crashed.  So I apologize.  Let me back up just a little

10  bit so that I know where we are.

11          So your affidavit says this -- obviously your

12  name is Deborah Sines; right?

13     A.   Right.

14     Q.   And is it true that now you're -- at this

15  time, you're retired and you live in Florida?

16     A.   That's true.

17     Q.   And you practiced law in Washington, D.C. for

18  more than 35 years?

19     A.   Yes.

20     Q.   And you make it clear in your affidavit that

21  your statements are being made on your own behalf and

22  not on behalf of the United States, the Department of

23  Justice, or the U.S. Attorney's Office for the District

24  of Columbia; is that right?

25     A.   Yes.

Video Deposition of Deborah Sines

```
1        Q.    During your career, did you try more than
2   100 cases?
3        A.    Yes.
4        Q.    And did you conduct approximately 500
5   investigations?
6        A.    Yes.
7        Q.    And before your retirement, you served as an
8   assistant U.S. attorney in the -- assistant U.S.
9   attorney?
10        A.    Yes.
11        Q.    Including in the District of Columbia?
12        A.    Yes.
13        Q.    And that lasted from 1996 to 2018?
14        A.    Yes.
15        Q.    And were you primarily in the homicide
16   section?
17        A.    I was except -- I think when I first started
18   out, I was in some senior felony position where I just
19   tried a couple of violent crimes, and maybe three months
20   later, I went to homicide.  I left homicide for one year
21   because I got angry and went to the narcotics section
22   for a year, and I tried one nine-month-long narcotics
23   conspiracy case and two or three murder cases that year.
24   And then I went back to homicide, served as a deputy
25   chief for a year, and then went back to the line.  So --
```

1        Q.    So --

2        A.    -- there was one year between 1996 and 2018

3   where I was in narcotics.  I was still doing murder

4   cases, but I was in narcotics.

5        Q.    So it -- would it be fair to say that you --

6   you were a prosecutor for a long time in the homicide

7   section in the U.S. Attorney's Office in the District of

8   Columbia?

9        A.    Yes, sir.

10        Q.    And what -- what -- it's a little unusual

11   because you were in the District of Columbia, as most

12   people are used to seeing these kind of prosecutions

13   done by -- by a district attorney's office, but because

14   of the way the district is set up, it's a federal --

15        A.    District.

16        Q.    -- the District of Columbia, the federal

17   district.  That's done by the U.S. Attorney's Office; is

18   that right?

19        A.    Yes.

20        Q.    So then -- to follow on in your affidavit,

21   you worked as a trial attorney in the Civil Rights

22   Division in the -- of the U.S. Attorney's Office as

23   well; is that correct?

24        A.    No, not the U.S. Attorney's Office.  That's

25   main justice.  The Department of Justice in D.C., but

1   you try cases all over the country, but your home

2   base -- your office is in D.C.

3        Q.   So you were in the Civil Rights Division of

4   the Department of Justice and it -- and that was from

5   1995 to 19- -- 1985 to 1996?

6        A.   Yes.  And while I was there, I tried mostly

7   racial violence cases.  I also -- I tried one slavery

8   case.  And I prosecuted -- I'll call them dirty cops --

9   law enforcement officers, excessive force, that kind of

10  stuff, but they all pleaded guilty.

11       Q.   And before that, you were a criminal defense

12  attorney in the Washington -- in Washington, D.C.?

13       A.   Yes, I was.

14       Q.   And I -- by the way, where did you go to

15  college and law school?

16       A.   Okay.  College was GW -- George Washington

17  University in Washington, D.C., and then I went to a law

18  school that no longer exists called the Antioch School

19  of Law also in Washington, D.C., and that's where I got

20  my JD.  Then I went to Georgetown University Law Center

21  where I got an LLM in trial advocacy.

22       Q.   All right.  Thank you.  And I see in 2017 you

23  were inducted as a fellow in the American College of

24  Trial Lawyers?

25       A.   Yes, I was.

1     Q.   Congratulations.

2     A.   Thank you.

3     Q.   That is a very prestigious honor.

4     A.   Thank you.

5     Q.   As I see in your affidavit, you say:  That

6   from 2016 to 2018 I was the lead assistant U.S. attorney

7   assigned to the murder of Seth Rich.

8          Is that right?

9     A.   Yes.

10    Q.   And you understood that he was shot and

11  killed in the 2100 block of Flagler Place Northwest in

12  Washington, D.C., on July 10th, 2016?

13    A.   Yes.

14    Q.   For two years you say you helped direct the

15  police investigation and coordinated the prosecutory

16  work related to Seth Rich's murder --

17    A.   Yes.

18    Q.   -- is that true?

19          In paragraph 10 of your affidavit, you

20  described some of the things that you did in your

21  investigation; is that right?

22    A.   Yes.

23    Q.   You say:  As part of your job during the

24  investigation of the murder of Seth Rich, you personally

25  reviewed and analyzed relevant evidence collected and/or

1    generated by the Metropolitan Police Department for the

2    District of Columbia.

3              Did you do that?

4        A.    Yes.

5        Q.    And you also personally reviewed and analyzed

6    evidence collected and/or generated by the Office of the

7    Chief Medical Examiner for the District of Columbia?

8        A.    True.

9        Q.    And you also reviewed and analyzed material

10   from the Department of Forensic Sciences for the

11   District of Columbia; is that right?

12       A.    Yes.

13       Q.    You also consulted with those law enforcement

14   agencies as well as the Federal Bureau of

15   Investigation -- or the FBI -- about the case; is that

16   right?

17       A.    Yes.

18       Q.    And you personally reviewed and analyzed

19   medical records related to the antemortem treatment of

20   Seth Rich for his gunshot wounds?

21       A.    Yes.

22       Q.    And you personally reviewed and analyzed

23   statements posted online about the case; is that right?

24       A.    Yes.

25       Q.    Also as part of your investigation, you

1   personally interviewed witnesses with information

2   relevant to the criminal investigation --

3        A.   Yes.

4        Q.   -- is that correct?

5        A.   Yes.

6        Q.   Are all those normal things that you would do

7   as part of a homicide investigation?

8        A.   Everything except the online stuff.

9   Occasionally, you also have to look -- you know, you

10  look at phone records and things like that, but it's

11  unusual to have so many online things.  Occasionally,

12  they come up.  People sometimes even film their own

13  murders, but it's unusual to have this much online

14  information all over the country on a case.

15       Q.   But you had conducted many, many homicide

16  investigations, and you conducted this one as you had

17  many others; is that right?

18       A.   That's right.

19       Q.   You go on to say that, during your

20  involvement with the criminal investigation, you became

21  aware of allegations published online, on air, or in

22  print that Seth Rich had stolen e-mails from the

23  Democratic National Committee, DNC; is that true?

24       A.   Yes.

25       Q.   And Mr. Rich, before his death, did work for

1      the Democratic National Committee; is that right?

2          A.   Yes.

3          Q.   And you say that where he was employed at the

4      time of his death.  And you -- you became aware of these

5      allegations posted online and on air that he had

6      provided e-mails to WikiLeaks from the -- from the DNC

7      and was murdered as a result.  You became aware of those

8      allegations?

9          A.   Yes.

10         Q.   You say, for example:  In May 2017, I became

11     aware of a Fox News story published online and on air

12     alleging that Seth Rich was involved in the hacking

13     of -- of the DNC e-mails.

14              Is that right?

15         A.   Yes.

16         Q.   And in August 2017 you became aware of

17     publications online also accusing Seth Rich's brother

18     Aaron Rich of working with his brother to download the

19     DNC e-mails and sell them on WikiLeaks in exchange for

20     monetary compensation.  You became of those

21     allegations -- you became aware of those allegations; is

22     that right?

23         A.   Yes.

24         Q.   Other online postings linked these alleged

25     activities to Seth Rich's murder; is that right?

```
 1        A.    Yes.

 2        Q.    Those are things that you became aware of?

 3        A.    Yes.

 4        Q.    Now, is it true that you were aware of no

 5   evidence of any contact between either Seth or Aaron

 6   Rich and WikiLeaks?

 7        A.    That's true.

 8        Q.    And you were the prosecutor investigating

 9   this murder; right?

10        A.    Yes.

11        Q.    You also -- is it also true that you are

12   aware of no evidence that Seth Rich ever improperly

13   downloaded information from the DNC or that he provided

14   such information or any other information to WikiLeaks?

15        A.    Yes, that's true.

16        Q.    And, again, you were the prosecutor assigned

17   to investigate this?

18        A.    Yes.

19        Q.    And you've already described what you did to

20   investigate this?

21        A.    Yes.

22        Q.    Is it true that you were aware of no evidence

23   that Aaron Rich was ever involved in the transmission of

24   stolen information from the DNC to WikiLeaks?

25        A.    That's true.
```

 1      Q.   Are -- let me ask you if this is true.  Are

 2  you aware -- aware of no evidence that Aaron Rich ever

 3  received any compensation from WikiLeaks?

 4      A.   That's true.

 5      Q.   Robert Mueller was a special counsel assigned

 6  by the Department of Justice to conduct an investigation

 7  as -- as a special counsel; is that right?

 8      A.   That's right.

 9      Q.   And Mr. Mueller is the former director of the

10  FBI; is that right?

11      A.   That's right.

12      Q.   And he was assigned a number of resources and

13  people to help him investigate a number of things

14  including alleged Russian interference with the 2016

15  election?

16      A.   Yes.  Mr. Mueller was also -- let's see -- he

17  was chief of homicide in the U.S. Attorney's Office for

18  the District of Columbia.  He was the United States

19  attorney San- -- for San Francisco in California.  He

20  was the United States attorney in Boston.  So he -- I

21  knew him because I met him in Boston when I was trying

22  some skinheads, and he was the boss in Boston.  And then

23  we worked together at the U.S. Attorney's Office.  He --

24  he was never my chief, but we did work together there.

25  And when he came back to do his special investigation,

1   they had their own offices.  They had their own -- they

2   weren't linked up in our computer system with us regular

3   DOJ people.  They were entirely separate.

4       Q.   But you were aware that he was a highly

5   experienced prosecutor and investigator?

6       A.   Absolutely.  Absolutely.

7       Q.   And, again, had been the director of the

8   Federal Bureau of Investigation --

9       A.   Yes.

10      Q.   -- is that right?

11      A.   Yes.

12      Q.   And you have read the publicly available,

13  redacted version of the Report on the Investigation into

14  Russian Interference in the 2016 Presidential Election

15  of special counsel's report; is that right?

16      A.   Yes.

17      Q.   And you were aware of no evidence that

18  contradicts, is inconsistent with, or undermines the

19  conclusions in the special counsel's reports at Volume

20  1, page 48 that WikiLeaks and WikiLeaks founder Julian

21  Assange made several public statements apparently

22  designed to obscure the source of the materials that

23  WikiLeaks was releasing; is that right?

24      A.   That's right.

25      Q.   In other words, you -- you have no evidence

1   or information that contradicts the statement made in

2   the special counsel's report that WikiLeaks and Assange

3   made statements to obscure the source of the materials

4   that's WikiLeaks was releasing?

5        A.   That's true.

6        Q.   And also you're not aware of any evidence

7   that contradicts, is inconsistent with, or undermines

8   the conclusion in the special counsel's report that the

9   statements about Seth Rich implied falsely that he had

10  been the source of the stolen DNC e-mails?

11       A.   That's true.

12       Q.   In other words, your information -- you have

13  no information to say that he -- that he -- to say

14  anything contrary that -- well, let me restate my

15  question.

16            Your information is that Assange and

17  WikiLeaks were falsely implying that Seth Rich was the

18  source of the stolen DNC e-mails?

19       A.   That's true.  Now, what I don't know,

20  Counsel, is -- I don't know what Mr. Mueller's team

21  examined.  I don't have a clue.  But my conclusions were

22  the same as the report.

23       Q.   And his report -- Mr. Mueller's report

24  concluded that Seth Rich was not the source of the

25  WikiLeaks e-mails; is that right?

Video Deposition of Deborah Sines

```
 1        A.   Yes, it did.  Concluded he was not the source

 2   of the stolen e-mails.

 3        Q.   Now, shortly after Seth Rich's murder, you

 4   began speaking with Aaron Rich; is that right?

 5        A.   Yes.

 6        Q.   And you may -- you kept in touch with him

 7   throughout the course of your involvement in the

 8   criminal investigation?

 9        A.   Yes.

10        Q.   Did Mr. Aaron Rich fully cooperate with you?

11        A.   Yes, he did.

12        Q.   And to the best of your knowledge, did he

13   fully cooperate with local and federal law enforcement

14   agencies investigating his brother's murder?

15        A.   Yes.

16        Q.   Now, you say this in your affidavit, but I

17   want to make sure it's clear on the record that it's

18   because of considerations concerning law

19   enforcement-sensitive investigative techniques and

20   applicable privileges and legal protections including,

21   but not limited to, a government or other privilege and

22   the attorney work-product doctrine, you were unable to

23   discuss any other topic related -- relating to the

24   investigation of the murder of Seth Rich; is that your

25   understanding?
```

1        A.    Yes.

2        Q.    And although this affidavit is not signed,

3   you did sign one; right?

4        A.    I did.

5        Q.    And you stated under penalty of perjury that

6   all of this was true and correct; is that right?

7        A.    Yes, I did.

8        Q.    Now, let me -- if I may turn to what's been

9   marked before as Exhibits 1 and 2 to your deposition.

10       A.    Hold on.  Thank you.  Got it.

11       Q.    Let's just start with Exhibit 1.

12       A.    Okay.

13       Q.    Exhibit 1 is a transcript of a portion of an

14   episode of a podcast called "Conspiracyland Episode 2"

15   and is a transcript of a portion of that where you speak

16   with Mr. Michael Isikoff; is that right?

17       A.    Yes.

18       Q.    And Mr. Isikoff is a reporter?

19       A.    I'd call him a journalist.

20       Q.    And you spoke with Mr. Isikoff about the Seth

21   Rich murder to some degree; is that right?

22       A.    Yes, I did.

23       Q.    And you already confirmed that Exhibit 1

24   truthfully transcribes your statements that you made and

25   the podcast itself, Episode 2; is that right?

1    A.    Yes.

2    Q.    And the statements that are included in -- in

3  Exhibit 1 that you make are truthful --

4    A.    Yes.

5    Q.    -- is that right?

6          Let me just walk you through a few of these.

7  First of all, as were accounted in Exhibit 1, you become

8  aware of conspiracy theories out on the Internet; is

9  that right?

10    A.    Yes.

11    Q.    Okay.  And as you already said, you used your

12  security clearance to ask about those; is that right?

13    A.    That's what it says.

14    Q.    Okay.  Yeah.  So Mr. Isikoff recites that you

15  used your security clearance to ask U.S. -- the U.S.

16  intelligence community.  That's what he says in the

17  podcast; is that right?

18    A.    That's what he says.

19    Q.    And you told him that; right?

20    A.    Yes.  Well -- but I did not have the

21  authority to tell him that.  I should not have.

22    Q.    But that was -- but -- but you made truthful

23  statements to him; is that right?

24    A.    Yes.

25    Q.    And a little later down in Exhibit 1, there's

 1    a discussion of the "what does it mean" website.  Do you

 2    see that?

 3         A.    I see it.

 4         Q.    Yes.  And the "what does it mean" web- --

 5    whatdoesitmean.com website reported just three days

 6    after Seth Rich's death and alleged that he was gunned

 7    down by a Hillary Clinton hit squad; is that right?

 8         A.    That's right.

 9         Q.    And you learned that there was a fake

10    bulletin circulated by the Russian SVR, the Kremlin's

11    version of the CIA, that said something similar; isn't

12    that right?

13         A.    That's what I told Mr. Isikoff.  I do not

14    have the authority to discuss that any further.

15         Q.    But -- but, again, as you said, you were

16    truthful in your --

17         A.    Yes.

18         Q.    -- communications with --

19               But you do know that the SVR is a Russian

20    intelligence agency; is that right?

21         A.    Yes, I do.

22         Q.    And are you aware that -- that the SVR puts

23    out false information out onto the Internet?

24         A.    Yes, I am.  Independently of this case.

25         Q.    And are you -- Mr. Isikoff says that the

Video Deposition of Deborah Sines

1    SVR's bulletin made the exact same allegations about

2    Seth Rich on the exact same day as the

3    whatdoesitmean.com story; is that true?

4         A.   Yes.

5         Q.   And then you say in Exhibit 1 that the

6    original report from the SVR alleged that Seth thought

7    he was meeting with the FBI and instead he was met by a

8    Hillary Clinton hit team.

9              That's what you said; right?

10        A.   That's what I said, but I -- I'm not sure

11   whether that was from whatdoesitmean.com or the SVR

12   report.  I -- I'm not sure which one alleged that.

13        Q.   Okay.  And did the original report also

14   allege that the hit team was captured after a running

15   gun battle with U.S. federal police -- with the U.S.

16   federal police force just blocks from the White House?

17        A.   It was either the whatdoesitmean.com report

18   or the SVR report.

19        Q.   Now, as a prosecutor in Washington, D.C.,

20   were you aware of any running gun battles blocks from

21   the White House the day of Seth Rich's murder?

22        A.   As a resident of the District of Columbia, I

23   would have been aware of it, not just as a prosecutor.

24   Things do happen in D.C. that require shutdowns of

25   streets, et cetera.  There was no shoot-out a couple of

Video Deposition of Deborah Sines

1   blocks from the White House the night Seth was murdered.

2       Q.   And is it true that -- well, you say here in

3   your -- in Exhibit 1 that -- that:  No.  It never

4   happened.  It's all made up.

5            Right?

6       A.   Yes.  That's exactly what I said.  It's all

7   made up.

8       Q.   And that includes that he was gunned down by

9   a Hillary Clinton hit squad?

10      A.   Yes.  That's -- that includes that.

11      Q.   And it -- does it also include that he

12  thought he was meeting with the FBI the night of his

13  murder?

14      A.   Yes.

15      Q.   Let me turn to the next page of Exhibit 1.

16  Did you think it was outrageous to have a foreign

17  intelligence agency set up one of the decedents that you

18  were investigating the murder?

19      A.   Yes, I did.

20      Q.   And you -- as set out in Exhibit 1, you

21  discovered that the Russians had planted the idea that

22  there was a conspiracy?

23      A.   That's what I said.  And that's the truth.

24      Q.   Now, this whatdoesitmean.com website purports

25  to be run by a secret order of nuns; is that correct?

Video Deposition of Deborah Sines

1    A.   I don't know if that's true or not.   That's

2  what Mr. Isikoff said.   I -- I have no idea who runs any

3  of those websites.

4    Q.   Did you also learn that there was another

5  bogus intelligence report a few weeks after the initial

6  fake bulletin?

7    A.   I -- I think I did.   I think I did.   Yeah.

8  And I think I told Mr. Isikoff I did.

9    Q.   And it -- and -- and what you told him was

10  true based upon what you knew; right?

11    A.   Yes.   Yes.

12    Q.   And you were very concerned that this was

13  coming from the SVR; right?

14    A.   Yes, I was.

15    Q.   Now, if you go on in this exhibit a little

16  father down after the -- there's a line there -- a later

17  part of this particular episode of the podcast.   It says

18  that you wrote a memo that you sent to the National

19  Security Division of the Justice Department; is that

20  right?

21    A.   Yes.

22    Q.   Okay.   And you also met with personnel who

23  were working with Special Counsel Robert Mueller?

24    A.   Yes.

25    Q.   And as the Mueller Report found that the --

1    the Russians did engage in a deliberate strategy to use

2    Seth Rich's murder to distract investigators in the

3    public from finding out what they had done during the

4    2016 election?

5         A.   Yes.

6         Q.   And you -- you agree, based upon your

7    investigation, with that?

8         A.   Yes.

9         Q.   And based upon that, you came to a conclusion

10   about why Russia was doing this; is that correct?

11        A.   I did.  I had my own speculation about that.

12   Yes.

13        Q.   Well, would you read that last paragraph

14   that --

15        A.   Sure.

16        Q.   -- from the podcast?

17        A.   So then you got to look at, Well, why is

18   Russia doing this?  And what else is going on?  Well,

19   what else is going on is we have a special counsel who

20   is investigating Russia stealing Clinton e-mails or DNC

21   e-mails.  And then -- I mean, it's not rocket science.

22   Before you add it up and you go, Oh, if Seth is the

23   leaker to WikiLeaks, it doesn't have anything to do with

24   Russia.  So, of course, Russia's interest in doing this

25   is incredibly transparent.  Let's blame it on Seth Rich.

Video Deposition of Deborah Sines

1   He's a very convenient target.

2       Q.   And that's what you believed based upon your

3   investigation?

4       A.   Yes.  I still believe it now.

5       Q.   Let me ask you a few more questions about the

6   Mueller Report, which you've already -- already

7   testified that you read.  The report found that the

8   Russians planted this story; is that correct?

9       A.   Yes.

10      Q.   And the report found that Seth Rich did not

11  leak the e-mails to WikiLeaks?

12      A.   Yes.

13      Q.   The -- Mr. Mueller's report found that the

14  Russians hacked the DNC servers; is that right?

15      A.   Yes.

16      Q.   And that the Russians provided the e-mails to

17  WikiLeaks?

18      A.   Yes.

19      Q.   And actually found that the e-mails that were

20  provided from the DNC to WikiLeaks were not provided to

21  WikiLeaks until several days after Seth Rich was

22  murdered?

23      A.   Yes.

24      Q.   So he wasn't even alive according to Special

25  Counsel Mueller's report at the time that the DNC

Video Deposition of Deborah Sines

1    e-mails were provided to WikiLeaks?

2        A.    Yes.

3        Q.    Ms. Sines, let me turn to Exhibit 2, the

4    Episode 5 transcript.  Do you have that before you?

5        A.    I do.

6        Q.    Okay.  And, again, this -- this transcript is

7    a -- truthfully transcribes your -- what is a portion of

8    this broadcast that you participated in; is that right?

9        A.    Yes.

10       Q.    And the statements that you made that are

11   contained in Exhibit 2 in this podcast are truthful?

12       A.    Yes.

13       Q.    Now, again, this portion of the podcast is

14   talking about the Fox News story about Seth Rich that

15   was first published on May 15th, 2017.  Do you

16   understand that?

17       A.    Yes.

18       Q.    And do you have any understanding that Mr.

19   Butowsky was involved in some way with respect to that

20   story?

21       A.    Yes.  Based on what Mr. Butowsky said on Fox

22   News, CNN, anybody else who would listen, he was the one

23   who was -- I think I have this right -- he was the one

24   that was inciting Rod Wheeler to do this conspiracy

25   theory story.

Video Deposition of Deborah Sines

1    Q.   You heard him say that on CNN or some other

2  media?

3    A.   Yes.  I sure did.

4    Q.   Now, this Fox News story was -- do you

5  understand that it was ultimately retracted about a week

6  or so after it was published?

7    A.   Yes.  So it would have been --

8    Q.   And --

9    A.   -- after it was retracted -- I'm sorry,

10  sir -- it would have been after it was retracted, and I

11  want to say Rod Wheeler filed some lawsuit against Fox

12  and Mr. Butowsky.  And then that's when Mr. Butowsky

13  went on Fox News and CNN and made several statements

14  about this case.

15    Q.   And you understand that this -- the Fox News

16  story that was retracted alleged that Seth Rich had some

17  communication with WikiLeaks?

18    A.   Yes.

19    Q.   Now, let -- let me turn back to Exhibit 2.

20  When -- when -- when the -- this story was released by

21  Fox, you say you were furious about it --

22    A.   I was.

23    Q.   -- is that right?

24    A.   Yes.

25    Q.   And why were you furious?

1      A.    First of all, I don't like anyone in the

2   media talking about an open murder case where we haven't

3   even made an arrest yet.  It -- it -- that's first of

4   all.  Second of all, there was false information.  And

5   then this one turned into a feeding frenzy.  All kinds

6   of people were coming out of the woodwork and buying

7   into this -- I call them self-anointed conspiracy

8   theorists.  And you have them on the left, you have them

9   on the right, but it makes my job harder because I have

10   to investigate all of that.

11         And in this particular case, it was so

12   bruising to the decedents' family.  And you got to

13   understand, I'm still in touch with that family.  That's

14   not the only family.  I have decedents where the trials

15   were over a hundred years ago, and they still reach out

16   to me even though I'm retired.  Those folks are

17   vulnerable.  They're crushed.  They've lost somebody

18   they love.  And in this particular case, Seth's parents

19   were just -- they were crushed.  And they felt so

20   betrayed by people they trusted.  And it was horrible.

21   So, yeah, I was livid.  I was furious.

22      Q.    And it also -- it just makes your job harder

23   as a prosecutor to try to get through all of this; is

24   that right?

25      A.    Yes.  And it also scares witnesses off.  They

1    start hearing about Russians and hit squads, and, you

2    know, all of that nonsense.  And it's hard enough in

3    D.C. to get somebody to tell the truth about what they

4    saw.  Add this to the mix, it makes it much more

5    difficult.  And, unfortunately, what happens is you

6    waste time investigating false conspiracy theories when

7    your time is so much better spent on working on your

8    murder.

9        Q.    Later in -- on this exhibit, Mr. Isikoff

10   says:  The specifics in the story -- the Fox story --

11   was that there was an FBI report about an FBI analysis

12   of Seth Rich's computer that showed he was in

13   communication with WikiLeaks.  And he asked you, Was

14   there any truth to that?

15           And what did you say?

16       A.    No.  None.  Complete fabrication.

17       Q.    And was that statement that you made

18   truthful?

19       A.    Yes.

20       Q.    The report also says that you reached out to

21   the FBI, and you said you did --

22       A.    That's what I said.

23       Q.    -- is that true?

24           And the report says that Mr. Isikoff asked

25   you:  What did they tell you?

1          And you said, No.

2          Is that right?

3     A.   Yes.

4     Q.   Now, that means that Seth Rich's computer did

5  not show that he was in communication with WikiLeaks; is

6  that right?

7     A.   That's right.

8     Q.   And, as a matter of fact, you said in this

9  report:  No.  No connection between Seth and WikiLeaks,

10  and there was no evidence on his work computer of him

11  downloading and disseminating things from the DNC.

12          That's what you said; right?

13     A.   Yes.

14     Q.   And that was true?

15     A.   Yes.

16     Q.   And --

17     A.   And that's what I shouldn't have said because

18  I did not have permission to disseminate that from the

19  Department of Justice.

20     Q.   Nevertheless, still true; correct?

21     A.   Yes, sir.

22     Q.   And it wasn't from some thumb drive that he

23  had?

24     A.   No.

25     Q.   Mr. Isikoff said that there was unusual

Video Deposition of Deborah Sines

1    activity by a foreign hacker after Seth Rich's death; is

2    that right?

3          A.    Yes.

4          Q.    And, in fact, there was some -- somebody

5    trying to hack into Seth Rich's Gmail account; is that

6    right?

7          A.    Yes.

8          Q.    After his death?

9          A.    Yes.

10         Q.    That wasn't Aaron Rich, was it?

11         A.    You know I'm not allowed to answer that,

12   but --

13         Q.    Is he from --

14         A.    -- Aaron Rich is not a foreigner.

15         Q.    Did you found -- you learned that a foreign

16   source was trying to hack into Seth's Gmail account?

17         A.    Yes.

18         Q.    Have you ever heard of any -- anyone by the

19   name of Defango?

20         A.    I'm not allowed to answer that.

21         Q.    Based upon your investigation, was the Fox

22   News story suggesting that there was communication

23   between Seth Rich and WikiLeaks?  Was the Fox News story

24   true or false?

25         A.    False.

1       Q.    And based upon the Mueller Report, was the

2   Fox News story suggesting that Seth Rich had

3   communicated with WikiLeaks -- was it -- was that Fox

4   News story true or false?

5       A.    False.

6       Q.    And did the Fox News story suggesting that

7   communication -- was that similar to the Russian

8   intelligence agencies' false claims trying to make

9   people think that Russia did not steal the DNC's e-mails

10  and supply them to WikiLeaks?

11      A.    Yes.

12      Q.    Now, since the podcast was published, have

13  you had any contact with Ed Butowsky?

14      A.    Ed Butowsky -- I believe it was Ed

15  Butowsky -- posted something on -- I don't know if it

16  was Instagram or a Tweet -- inviting me to look at

17  something.  I ignored it.  I've never spoken to him, and

18  I've had no contact with him.

19      Q.    Has he ever harassed you in any way?

20      A.    I don't know.

21      Q.    What about Matt Couch?  Have you ever had any

22  communication with him?

23      A.    No, I have not.

24      Q.    Has he harassed you in any way that you're

25  aware of?

1        A.    I don't know.

2        Q.    Have you been harassed in any way since -- by

3    anyone -- since the podcast?

4        A.    I have received some -- I don't know if the

5    right term is "unpleasant" -- because of -- I've had to

6    have three different details of U.S. marshals for

7    security purposes in different cases totally unrelated

8    to this, but because of that, I'm a little gun-shy when

9    people start getting very ardent and ugly with me.   And

10   after that podcast, I become concerned of being accused

11   of being a "Deep State" liar.   And I got to say, there's

12   no such thing as a "Deep State" prosecutor.   Okay.   I'm

13   sure there are dirty prosecutors that don't do their

14   job, but my concern for my physical safety is I don't

15   have protection from the federal government anymore.   So

16   if some moron reads that stuff and believes it and

17   decides, like in Pizzagate, he's going to come shoot up

18   my house, all I've got is me.   So I -- I don't know

19   who's behind that.   I don't know who's done that.   I

20   just ignore it.   And I've -- I've stopped talking about

21   any case -- well, that's not true -- about this case at

22   all.

23       Q.    Let me ask you.   You were asked earlier about

24   some of your political opinions and opinions about the

25   president.   Do your -- any of your political

1   opinions have -- did they have any impact on your

2   investigation in the Seth Rich case?

3        A.   Of course not.

4        Q.   Or on the opinions that you've expressed in

5   Exhibit 1 and Exhibit 2 or your affidavit?

6        A.   Absolutely not.  You got to understand,

7   Counsel, you -- you -- when -- when you're a federal

8   prosecutor -- and -- and I believe a lot of DAs are like

9   this too, except maybe the elected ones, you -- you --

10  all you want to do is vindicate a murder, and you've got

11  to be fair to whoever the defendant turns out to be.

12  And that's a juggling act.  It's hard.  Because

13  sometimes you don't feel like you should be fair.  What

14  they've done is despicable, but you have to.  That's the

15  oath.  It doesn't matter who your boss is.  I --

16  literally, I've worked -- I've worked for Reagan, Bush

17  1, Bush 2.  It never mattered.  In fact, the first

18  Democrat I ever worked for was -- I think Bill Clinton,

19  and I learned real quick the Democrats make you write

20  more memos.  And, you know, I -- I was excited, Oh, it's

21  the first time I ever worked for a Democrat.  Just more

22  memos.  That's the only difference.  It -- it doesn't

23  matter who the boss is as long as it's that justice

24  thing.  I -- I've never had a Republican challenge my

25  worth as -- as a prosecutor or my motivation ever, but

1    it's different now.

2         Q.   Did you aggressively investigate the Seth

3    Rich murder?

4         A.   Yes, I did.

5         Q.   Did you use all the tools available to you to

6    try to find who killed him?

7         A.   I tried to.  I tried to.

8         Q.   You did your very best?

9         A.   Yes, I did.  But it's sitting right here on

10   my shoulder.  The ones -- the cases where you don't

11   close it or if you lose a trial and you shouldn't have

12   lost, it's -- it stays right on your shoulder and it

13   stays with you and it makes you feel horrible.

14        Q.   And you feel a great obligation as a

15   prosecutor to try to achieve justice for Seth Rich and

16   for his family; is that right?

17        A.   Absolutely.

18        Q.   And you still do today even though you're

19   retired?

20        A.   I know.  I still do.  Yeah.

21        Q.   Let me ask you one more thing -- one more

22   kind of clean-up thing.  You brought some documents with

23   you to your deposition --

24        A.   I did.

25        Q.   -- and I'd -- I'd like -- and I'd like to

Video Deposition of Deborah Sines

1   just mark them all, I guess excluding the affidavit that

2   we've already pulled out, and just mark them as an

3   exhibit, if that's okay.

4        A.   It's fine with me.  The court reporter just

5   gave you a dirty look, but it's fine.  She didn't.  I'm

6   lying.

7             You want all of them marked?

8        Q.   Just as one exhibit.  Just all of the pages,

9   yes.  Except for the affidavit, which I think we've

10  pulled out.

11       A.   Oh, okay.  She'll do it.

12            (Defendants' Exhibit No. 7 was marked for

13  identification.)

14  BY MR. HARPER:

15       Q.   I think this would be Exhibit 7.  Ms. Sines,

16  is Exhibit 7 before you?

17       A.   No, it -- yes.

18       Q.   And is Exhibit 7 a copy of documents you

19  brought with you today, absent the affidavit that we

20  already talked about, in response to the subpoena that

21  you received from Mr. Butowsky's counsel?

22       A.   Yes.

23       Q.   And let me just walk through this.  The first

24  page -- an -- an order in a case between Mr. Butowsky

25  and Mr. Gottlieb?

1      A.   Yes.

2      Q.   Okay.  And then if you turn -- I guess to the

3  third page -- it starts to be a letter dated March 2nd?

4      A.   Yes.

5      Q.   To Mr. Clevenger from Timothy J. Shea and

6  Daniel Van Horn; is that right?

7      A.   Yes.

8      Q.   Okay.  And if you turn a couple more pages,

9  there is a letter from Mr. Clevenger dated

10 February 17th --

11     A.   Yes.

12     Q.   -- is that right?

13     A.   Yes.

14     Q.   And then after that, there are several pages

15 of e-mails; is that right?

16     A.   Yes.

17     Q.   E-mails that are between you and -- and other

18 people; right?

19     A.   The Rich family.

20     Q.   And those are true copies of communications

21 you had with the Rich family?

22     A.   Yes.

23          MR. HARPER:  Let me -- let me take a short

24       break.  Maybe two minutes.  And then I'll come

25       back, and I should be finished, if that's all

 1         right.

 2              THE WITNESS:  You promise?

 3              MR. HARPER:  I promise.

 4              THE WITNESS:  I'm getting older by the

 5         minute.

 6              MR. HARPER:  So am I.

 7              THE WITNESS:  Okay.

 8              THE VIDEOGRAPHER:  Time is 1:10, and we're

 9         off the record.

10              (Recess had from 1:10 p.m. to 1:11 p.m.)

11              THE VIDEOGRAPHER:  Time is 1:11, and we're

12         back on the record.

13     BY MR. HARPER:

14         Q.   Ms. Sines, I want to thank you again for

15     coming in today in this difficult time.  And I also want

16     to thank you for your service as a prosecutor and as an

17     assistant U.S. attorney.  I want to thank you for your

18     service to the people of the United States.

19         A.   Thank you.

20              MR. HARPER:  And with that -- and with that,

21         I'll pass the witness.

22                        REDIRECT EXAMINATION

23     BY MR. CLEVENGER:

24         Q.   I do have a few follow-up questions, Ms.

25     Sines.  We went -- Mr. Harper went through the affidavit

Video Deposition of Deborah Sines

```
 1   that you submitted, and I'd like to look at that

 2   briefly.  I forget what the exhibit number that is.

 3        A.    That's okay.  We'll find it.

 4        Q.    But --

 5        A.    Wait a -- wait a second.

 6        Q.    Okay.

 7        A.    Thank you.  It's Exhibit Number 6, Counsel.

 8        Q.    Okay.  Thank you.  Very good.

 9        A.    You're welcome.

10        Q.    There are several paragraphs where you say

11   that you are aware of no evidence.  So, for example,

12   paragraphs 12, 13, 14, 15.  Paragraph 12:  I'm aware of

13   no evidence of any contact between Seth or Aaron Rich

14   and WikiLeaks.

15             But, at the same time, you can't tell us

16   whether you -- you ever attempted to speak with Julian

17   Assange or anybody with WikiLeaks; correct?

18        A.    The Department of Justice decided that I am

19   not permitted to tell you how it is that I am aware of

20   no contact between Seth or Aaron Rich and WikiLeaks.

21        Q.    Well --

22        A.    The most they will let me say is that I

23   thoroughly reviewed evidence, but I'm not allowed to say

24   what all that evidence was.

25        Q.    Well, in this case, I mean, you can't prove a
```

1    negative, can you?  I mean --

2         A.    I don't know what that means, sir.

3         Q.    Is it -- well, I mean, there could be

4    evidence out there that you're just not yet aware of; is

5    that correct?

6         A.    That's always the case.  Yes.  That's

7    correct.

8         Q.    And so in the next paragraph:  I'm aware of

9    no evidence that Seth Rich ever improperly downloaded

10   information from DNC.

11        You know -- and you can't say with any

12   certainty that the evidence doesn't exist, can you?

13        A.    I can say what it didn't exist on that was

14   examined, but, unfortunately, I'm not allowed to tell

15   you what that is.

16        Q.    Okay.  Paragraph 14:  I'm aware of no

17   evidence that Aaron Rich was ever involved in the

18   transmission of stolen information from the DNC to

19   WikiLeaks.

20        You -- again, you can't tell us whether

21   you've -- in fact, can you tell us whether Robert

22   Mueller ever tried to make contact with WikiLeaks?

23        A.    I'm not involved in his investigation.  I

24   can't tell you what he did.  I have no idea.

25        Q.    Well, are you aware of Mr. Mueller's

1    acknowledgement or his admission that he never even had

2    his agents examine the DNC's e-mail servers?

3         A.   No.  I'm not aware of that at all.

4         Q.   So you're not aware of the fact that

5    Mr. Mueller has admitted that he relied exclusively on a

6    redacted report by CrowdStrike?

7         A.   No.  I'm not aware of that at all.

8         Q.   Can you say whether you took any

9    investigative steps beyond what Mr. Mueller did in that

10   regard?

11        A.   No.  I can't say what he did, and I'm not

12   allowed to say what I did.

13        Q.   Okay.  You said that Aaron Rich fully

14   cooperated earlier.  Would -- would that statement

15   change if you found out that Mr. Rich had withheld

16   certain evidence from you?

17        A.   Yes.

18        Q.   And I believe you testified earlier, and

19   correct me if I'm wrong, that -- that Mr. Butowsky said

20   on television that he instigated Rod Wheeler's

21   conspiracy theory.  Was that what you said?

22        A.   I said that he instigated Rod Wheeler's -- or

23   at least what I meant to say -- going on Fox and doing

24   the story because the White House wanted him to go on

25   it.  That's what Mr. Butowsky said, but then Mr.

Video Deposition of Deborah Sines

```
 1   Butowsky -- I want to say it was on CNN -- he said, Oh,

 2   no.  No.  No.  That's a code name for Detective

 3   DellaCamera who wanted to be a whistleblower.  I

 4   personally know all of that is false.  I heard your

 5   client say it.  I was stunned.  However, I -- that's

 6   what I meant, was it was Mr. Butowsky who was telling

 7   Rod Wheeler, you know, The White House wants you to do

 8   this story; it's a go; of course, it's all on you,

 9   but -- that's what I was referring to.

10        Q.   Okay.

11        A.   That's based on e-mails your client sent to

12   Mr. Wheeler that I saw.

13        Q.   But you don't know whether my client was

14   telling Mr. Wheeler how to conduct his investigation, do

15   you?

16        A.   I know Mr. Butowsky was saying things to Seth

17   Rich's parents.  And I knew he was betraying them.  I

18   watched your client very carefully when he was on CNN.

19        Q.   Let's get specific about that.  How do you --

20   how do you -- how do you know that -- what my client

21   said to the Riches?

22        A.   I've seen -- I'm not allowed to answer that.

23   I'm sorry.

24        Q.   Well, I'm sorry.  You've already opened the

25   door to that.
```

Video Deposition of Deborah Sines

114

1    A.    I may have, but I'm not allowed to tell you

2    what I did during my investigation, so I'm not allowed

3    to answer that.  Sorry.

4    Q.    Well, you just testified a minute ago that my

5    client was somehow exploiting the Riches?

6    A.    I did.

7    Q.    Is that -- is that your testimony?

8    A.    Yes.

9    Q.    Okay.  Well, then give it --

10   A.    Well, you've --

11   Q.    Give specific examples.

12   A.    You've already seen on -- on television, you

13   know.  Your client did a press conference with the

14   Riches vowing he was going to do all of this stuff, and

15   then after he got exposed by -- I guess it's Rod

16   Wheeler, the Riches essentially fired your client and

17   said, You don't have our permission, and stop speaking

18   for us.  I mean, that's -- that's what I call using very

19   vulnerable people.

20   Q.    Well, let's -- let's get specific here.  When

21   was the day that my client held his press conference?

22   A.    I don't know.  He did it with the Rich family

23   before the Fox News story.  I -- I don't know.

24   Q.    How certain are you -- are you 100 percent

25   certain that that took place?

 1        A.    No, I'm not.  I -- you know what?

 2        Q.    Okay.

 3        A.    I did see him on TV talking about helping the

 4    Rich family and paying for Mr. -- I don't know if he

 5    said he was paying for Mr. Wheeler, but saying he was

 6    helping them to investigate their son's murder.

 7        Q.    Okay.  So how else do you think my client

 8    exploited the Riches?

 9        A.    I don't -- I think he had his own agenda.

10        Q.    Okay.  Well --

11        A.    I think he was working on this Fox News story

12    and that's -- that's what he did.  He certainly didn't

13    provide any information from any independent

14    investigation to the prosecution team.

15        Q.    That was Mr. Wheeler's job, wasn't it?

16        A.    Not if your guy was the one paying the bucks

17    for it.  No.

18        Q.    Well, if my client testifies and the records

19    show that he agreed to pay for Mr. Wheeler, but he was

20    not directing the investigation, does that affect your

21    answer?

22        A.    No, sir.  Not at all.

23        Q.    So you don't care what the evidence says;

24    you've got your mind made up?

25        A.    No.  I saw the evidence.  I feel the same way

 1    about Mr. Wheeler.  Your guy --

 2         Q.   What evidence --

 3         A.   -- exposed himself on CNN.  That's -- that's

 4    my evidence.  That's -- to me that was cruel, dishonest,

 5    and, frankly, I just wish I could have cross-examined

 6    him, but I wasn't there.

 7         Q.   Well, frankly, I wish I could get you to

 8    answer all of my questions, but --

 9         A.   I've answered your question.  I -- I think

10    your client was dishonest, and I think he used a very

11    bruised, crushed family, and I think that's incredibly

12    mean.  That's what I believe.  And I believe that --

13         Q.   Okay.  And I'm --

14         A.   -- based on your client's conduct.

15         Q.   Okay.  And I'm asking you what specific

16    conduct?

17         A.   Everything he said on CNN.  Everything.

18         Q.   Okay.  And do you recall what it was that he

19    said on CNN?

20         A.   No.  I'd have to get a transcript of it now.

21    It was a long time ago.

22         Q.   Okay.  So you're just kind of winging it

23    here, aren't you?  You're not sure?

24         A.   No, sir.  I'm positive.  I firmly believe

25    everything I just said about your client based on his

Video Deposition of Deborah Sines

```
 1    television performance on CNN.  I'm a witness here.

 2         Q.   Well, you just testified --

 3         A.   I'm not a plaintiff.  I'm not an attorney.

 4    I'm just a witness.  So --

 5         Q.   I understand that, but you --

 6         A.   -- I -- I don't prepare to testify if I'm

 7    telling the truth.  I'm not watching --

 8         Q.   But you --

 9         A.   -- that stuff again.  It was too abhorrent

10    when I saw it live.

11         Q.   Okay.  You just testified that my client

12    appeared at the press conference with the Riches?

13         A.   I could have that one wrong.  He might have

14    just done -- there might have just been a press release.

15    I thought --

16         Q.   Okay.

17         A.   -- I saw him with them, but I could have been

18    wrong.  That's a long time ago --

19         Q.   Okay.

20         A.   -- but I'm not wrong about what I saw on CNN.

21         Q.   If my client testified that he never drafted

22    a press release, made any public statements for the

23    Riches, would you have any reason to contradict that?

24         A.   No.

25         Q.   How did you know it was a foreign person who
```

1    tried to hack into Seth Rich's Gmail account?

2         A.   I'm not allowed to answer that.

3         Q.   Well, are you aware that you can use a remote

4    server in another country to make it look like you're

5    acting from another country?

6         A.   I'm not allowed to answer that.

7         Q.   I'm asking you if you are aware of that

8    generally?  Are you aware that --

9         A.   Yes.  Yes.  I am aware of that.

10        Q.   But you can't tell us how you know for sure

11   that this was a foreign person who hacked in?

12        A.   No.  I'm not allowed to tell you that.  I

13   can't even tell you who it is.  I wish I could.

14        Q.   I want to look at page 9 of some of the

15   e-mails.

16        A.   Which exhibit?

17        Q.   I'm not sure what -- how that was numbered.

18   It was the documents that you produced.  It was the

19   ninth page in the -- in the PDF file that I was sent.

20             (Off-the-record discussion.)

21             THE WITNESS:  There's a series of e-mails

22        between me and the Rich family and between me and

23        Michael Isikoff and Andy Kroll.  So which ones?

24   BY MR. CLEVENGER:

25        Q.   This would be a Friday, July 13, 2018, e-mail

Video Deposition of Deborah Sines

1  from you to Mary Ann and Joel Rich.

2        A.    Okay.

3        Q.    And Aaron Rich.

4        A.    I've got it.

5        Q.    Good folks:  With the indictment of numerous

6  Russian GRU intelligence agents for the 2016 DNC hack, I

7  am hoping this will make ugly people stop falsely

8  accusing Seth and will also make them stop harassing

9  you.

10              Is that correct?

11       A.    Yes.

12       Q.    That's what you wrote?

13       A.    Yes.

14       Q.    Were you aware that all of those indictments

15  were dismissed this week by DOJ?

16       A.    Sure am.

17       Q.    So --

18       A.    I'm aware of all the pardons that have been

19  issued.  I'm aware of all of the cases that have been

20  either pardoned or dismissed by the Department of

21  Justice.  I'm very well aware.

22       Q.    What -- okay.  What -- what are you talking

23  about?

24       A.    I'm talking about cases that were indicted

25  and didn't go to trial and then got dismissed by the

 1   Department of Justice.

 2        Q.    Okay.  So with reference to this case, and --

 3   are you aware of the fact that -- that the case was

 4   dismissed because there wasn't enough evidence to even

 5   prosecute it?

 6        A.    No.  I disagree 100 percent with you saying

 7   that.

 8        Q.    Okay.

 9        A.    I don't believe that's why those cases were

10   dismissed.

11        Q.    So you think -- you're arguing that they were

12   dismissed for political reasons?

13        A.    I don't -- I can't say -- yeah, I can.  Yes,

14   I am saying that.  That is my feeling.

15        Q.    You --

16        A.    Yes.

17        Q.    Okay.  Well, what do you know about those

18   cases?

19        A.    Same thing everyone knows.  I've read the

20   indictments.  It's all I'm allowed to know about those

21   cases.  I know a grand jury indicted them.

22        Q.    And so you're just going on faith here that,

23   if they were indicted, they must have been -- there must

24   have been enough evidence?

25        A.    No.  I read the Mueller Report as well.

1    Q.   So you're a believer in the Mueller Report;

2  is that fair to say?

3    A.   I believe the evidence that I saw in the

4  Mueller Report.  That's very fair to say.

5    Q.   Well, are you aware significant parts of that

6  report have been discredited?

7    A.   By whom, Mr. Clevenger?

8    Q.   Well, for example, Mr. Mueller's own

9  admission that he never even examined the DNC's e-mail

10  servers.

11    A.   That doesn't discredit his report and what he

12  found.

13    Q.   Well, you're going to believe that report,

14  isn't it true, because you want to believe that report?

15    A.   No, sir.  I am a prosecutor with 35 years of

16  prosecutorial experience.  I believe the report because

17  I read it.  The minutiae in it was enough to make anyone

18  vomit.  If anything, there was too much evidence in it.

19  It took me forever to read that.  I believed --

20    Q.   Okay.

21    A.   -- the report because it was thorough.  And I

22  believed the report because I know Bob Mueller.  I know

23  how hard he works.  I know he makes you come to meetings

24  at 7:00 a.m.  I know how much integrity that man has.

25  That's why I believe the Mueller Report.

1    Q.   And so it doesn't matter whether he admits

2  that he relied exclusively on a third-party contractor's

3  redacted report?  You still think that's a credible

4  document?

5    A.   I still think the indictments of the GRU

6  intelligent agents for the 2016 DNC hack should not have

7  been dismissed.

8    Q.   And you don't say that based on any kind of

9  inside knowledge, do you?

10    A.   Just my experience, which may not mean much

11  to some people, but it means a lot to me.

12    Q.   Well, when you say your experience -- but

13  you're relying entirely on things that are in the public

14  record; is that correct?

15    A.   I -- I can't ignore -- I -- I can't answer

16  that.

17    Q.   So are you relying on any kind of insider

18  knowledge that you have?

19    A.   I can't answer that.

20    Q.   Well, I want to go -- the -- I really want

21  the -- the area that I was interested in -- going

22  specifically to who was responsible for these leaks.  If

23  Bob Mueller admits that he was a -- relying entirely on

24  a redacted third-party report, does that not shed

25  some -- cause some doubt about the veracity of the

 1   report?

 2           MR. HARPER:  Objection to form.

 3           THE WITNESS:  Not to me, it doesn't, sir,

 4       but you'd have to talk to Mr. Mueller about that.

 5       His report isn't just based on one piece of

 6       evidence, as you know.

 7   BY MR. CLEVENGER:

 8       Q.   I'm not -- I'm not concerned about all of the

 9   other elements of his report.  I'm concerned about the

10   e-mail leak.  That's why I'm asking specifically

11   about --

12       A.   I'm not trying to argue with you.  I told you

13   I believe the report.  I believe there is sufficient

14   evidence in the report, and I believe there was

15   sufficient evidence for the intelligence -- Russian

16   intelligence agents to be indicted.  So did the grand

17   jury.  And I -- I really have nothing else to say about

18   that.  I -- I wasn't there.

19       Q.   Well, in your 35 years as a prosecutor, have

20   you ever heard of another case where law enforcement,

21   whether FBI or local, was investigating a

22   computer-related crime that they never personally

23   examined the evidence; they just relied on a third-party

24   contractor and accepted a redacted report?

25           MR. HARPER:  Objection to form.

Video Deposition of Deborah Sines

```
 1              THE WITNESS:  I don't have -- I don't have
 2         the experience to answer that question.  As you
 3         pointed out earlier, sir, I'm -- you know, I'm
 4         not an expert in GRU intelligence work.
 5    BY MR. CLEVENGER:
 6         Q.   I'm not asking you about GRU intelligence
 7    work.  I'm -- I'm asking about any crime that involves a
 8    computer or electronic evidence.  With 35 years as a
 9    prosecutor, have you ever heard of another case where
10    the prosecution and/or law enforcement relied
11    exclusively on a third-party report?
12         A.   I can't answer that.
13              MR. HARPER:  Objection to form.
14              THE WITNESS:  I don't know.  I don't know.
15    BY MR. CLEVENGER:
16         Q.   Well, I guess that's my question.  Do you
17    know of another case like that?
18         A.   I don't know enough about computer-fraud
19    cases to answer your question.  I do not have the
20    expertise.
21              MR. CLEVENGER:  No further questions.
22              THE VIDEOGRAPHER:  Time is --
23                   RECROSS-EXAMINATION
24    BY MR. HARPER:
25         Q.   Ms. Sines, let me ask you one thing.  There
```

1    were some reporting that the Guccifer indictments --

2    in -- in those cases that the lawyers for the -- for the

3    defendants, were seeking some form of discovery which

4    might have revealed U.S. intelligence agency methods.

5    Had you heard anything like that?

6        A.    I -- I -- I've heard it, but I don't know if

7    it's true or not, which -- which would be a reason to

8    dismiss a case to keep the intelligence source's

9    secrets, you know, not put other lives in danger.  I --

10   but I don't know.

11       Q.    Did you -- you don't know why those

12   indictments were dismissed?

13       A.    Of course I don't.

14       Q.    And, again, in talking about your

15   investigation into the murder of Seth Rich, you -- you

16   tried to make use of every available tool to conduct

17   that investigation and to try to solve that murder; is

18   that right?

19       A.    Yes.

20            MR. HARPER:  I don't have anything further.

21        Thank you, again, so much for your time today.

22            THE WITNESS:  Thank you.

23               FURTHER REDIRECT EXAMINATION

24   BY MR. CLEVENGER:

25       Q.    I do -- I do have one -- I do have one

1  follow-up on -- based on that last statement.  When

2  you're saying you used every available tool, you're

3  still not able to tell us, though, whether you attempted

4  to contact WikiLeaks or anybody involved with WikiLeaks;

5  is that correct?

6      A.   I'm not allowed to tell you anything about

7  what I actually did during my investigation while I was

8  employed by the Department of Justice.

9           MR. CLEVENGER:  Okay.  Thank you.  And thank

10     you for your time.

11          THE WITNESS:  Thank you.

12          THE VIDEOGRAPHER:  Time is --

13          MR. HARPER:  Thank you, Ms. Sines.

14          THE VIDEOGRAPHER:  Time is 1:33, and this

15     ends today's deposition.

16          THE COURT REPORTER:  Mr. Clevenger, would

17     you like to order the transcript?

18          MR. CLEVENGER:  Yes, please.

19          THE COURT REPORTER:  Mr. Harper, would you

20     like a copy?

21          MR. HARPER:  Yes.

22          (Deposition concluded at 1:35 p.m.)

23

24

25

Video Deposition of Deborah Sines

```
 1                      CERTIFICATE OF OATH

 2

 3   STATE OF FLORIDA    )

 4   COUNTY OF FLAGLER   )

 5

 6           I, Mykel K. Miller, Registered Professional

 7   Reporter, Florida Professional Reporter, and Notary

 8   Public, State of Florida, certify that the

 9   aforementioned witness personally appeared before me and

10   was duly sworn on this date:  March 20, 2020.

11

12           WITNESS my hand and official seal:

13   March 31, 2020.

14

15

16

17

18                     _____
                       Mykel K. Miller, RPR, FPR
19                     Registered Professional Reporter
                       Florida Professional Reporter
20                     Notary Public - State of FL
                       Commission No.:  GG261196
21                     Expires:  09-23-2022

22                     Digital Signature Authenticated
                       by Symantec

23

24

25
```

1                    CERTIFICATE OF REPORTER

2

    STATE OF FLORIDA   )

3

    COUNTY OF FLAGLER  )

4

5              I, Mykel K. Miller, Registered Professional

6    Reporter, Florida Professional Reporter, certify that I

7    was authorized to and did stenographically report the

8    foregoing proceedings; that a review of the transcript

9    was requested, and that the transcript is a true and

10   complete record of my stenographic notes.

11             I further certify that I am not a relative,

12   employee, attorney, or counsel of any of the parties,

13   nor am I a relative or employee of any of the parties'

14   attorney or counsel connected with the action, nor am I

15   financially interested in the action.

16             DATED March 31, 2020, in Flagler County,

17   Florida.

18

19

20                        _Mykel Miller_

21                        _____
                          Mykel K. Miller, RPR, FPR
                          Registered Professional Reporter
22                        Florida Professional Reporter

23                        Digital Signature Authenticated
                          by Symantec

24

25

Video Deposition of Deborah Sines

```
1              IN THE UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF TEXAS
2                        SHERMAN DIVISION

3

4

   EDWARD BUTOWSKY,
5
       Plaintiff,
6
   -vs-                        CASE NO.: 4:18-cv-00442-ALM
7
   DAVID FOKENFLIK, ET AL.,
8
       Defendants.
9   _____/

10

   IN RE:  Deposition of:  DEBORAH SINES
11
   Date Taken: March 20, 2020
12
   Date Sent to Attorney:
13

14
              The referenced transcript has been completed
15  and awaits reading and signing.

16            Please have your witness read over your copy
   of the transcript and note any corrections on the
17  enclosed Errata Sheet, and forward only the Errata Sheet
   to Southern Reporting Company at 747 South Ridgewood
18  Avenue, Suite 107, Daytona Beach, Florida, 32114; or
   please have your witness contact Southern Reporting
19  Company at 386-257-3663 to make arrangements to read
   their transcript.
20
              Please complete by the time of trial or
21  within 30 days.

22            The errata sheet, once received, will be
   forwarded to all ordering parties as listed below.
23  Thank you.

24  Cc:  Ty Clevenger, Esquire; David Harper, Esquire

25
              **All ordering parties may not be listed**
```

1               ERRATA SHEET

2    IN RE:  Edward Butowsky vs. David Fokenflik, et al.

3    Deposition of DEBORAH SINES, taken 03/20/2020

4

5    Page    Line                Change/Reason

6    ____    ____    _____

7    ____    ____    _____

8    ____    ____    _____

9    ____    ____    _____

10   ____    ____    _____

11   ____    ____    _____

12   ____    ____    _____

13   ____    ____    _____

14   ____    ____    _____

15   ____    ____    _____

16   ____    ____    _____

17   ____    ____    _____

18   ____    ____    _____

19   ____    ____    _____

20   ____    ____    _____

21   ____    ____    _____

22   Under penalties of perjury, I declare that I have read
     the foregoing document and that the facts stated in it
23   are true.

24

25   _____    _____
     Date                    Signature